**In re Neil D. JACKSON and Ann E. Jackson, Debtors.**

**GANIS CORPORATION OF CALIFORNIA, Plaintiff,**

v.

**Neil D. JACKSON and Ann E. Jackson, Defendants.**

**Bankruptcy No. 87–10392–JNG. Adv. No. 87–1342.**

United States Bankruptcy Court, D. Massachusetts.

Aug. 12, 1988.

Charles R. Dougherty, Hill & Barlow, Boston, Mass., for plaintiff.

Harold Potter, Jr., Sherburne, Powers & Needham, Boston, Mass., for defendants.

## MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

### INTRODUCTION

The matter before the Court is the adversary complaint filed on November 20, 1987 by Ganis Corporation of California ("Ganis") against the Debtors, Neil D. and Ann E. Jackson (the "Debtors" or the "Jacksons"). Ganis asserts claims against the Debtors in its two count complaint under section 523(a)(2)(A) and (B) of the Bankruptcy Code. The claims arose in 1984 as a result of a tax shelter scheme through which the Jacksons were to purchase a yacht with a loan obtained from Ganis and then lease it back to an outfit, Inter Island Charters, Inc., that would service the debt through funds generated from charters of the yacht.

The Debtors filed a timely answer to Ganis' complaint. After a period for dis-covery, the matter was tried on June 22, 1988 and June 23, 1988. Five witnesses testified: Roger T. Kirwan, the president of Ganis, Richard J. Tracy, an expert in the area of marine vessel financing, Timothy R. McHugh, an attorney specializing in admiralty law, and Neil D. Jackson and Ann E. Jackson. The Court now makes the following findings of fact and conclusions of law.

### FACTS

Neil Jackson is a medical doctor affiliated with the Massachusetts General Hospital. Until recently, he and his wife resided in Swamscott, Massachusetts, a desireable North Shore community. Prior to taking a position at the Massachusetts General Hospital in 1982, Dr. Jackson was engaged in the private practice of medicine in the Salem/Lynn/Marblehead area.

In 1969 or 1970, Dr. Jackson, following eight years of service with the United States Navy, was a staff physician at the United States Naval Hospital in Chelsea, Massachusetts. His fellow physicians introduced him to Paul Garfinkle ("Garfinkle"), a lawyer/accountant, who prepared tax returns for many of the doctors at the naval hospital. Dr. Jackson obtained tax advice from Garfinkle while practicing at the naval hospital.

Upon completing his naval duties in 1971, Dr. Jackson began practicing medicine on the North Shore. He consulted with Garfinkle about the mechanics of setting up and managing his private practice. He continued to consult with Garfinkle and, in 1974, the Jacksons invested in a single limited partnership based upon Garfinkle's recommendation.

Dr. Jackson eventually merged his practice with those of three other doctors. The doctors agreed to retain accounting and legal professionals for the partnership who had been unassociated with any of their existing practices. Consequently, the Jacksons, who met with Garfinkle to explain the changed circumstances to him, lost touch with Garfinkle after 1975 or 1976.

In the early 1980's, the Jacksons were notified by the Internal Revenue Service that they had been assessed an additional tax liability of $24,000 as a result of their investment in the limited partnership recommended to them by Garfinkle. The Jacksons got in touch with Garfinkle, who was then living in Florida, and later met with him in Boston. Garfinkle reassured the Jacksons about their investment. He also offered to review their tax returns and current tax situation. The Jacksons agreed and, at subsequent meetings in the spring of 1984, Garfinkle proposed a series of investments designed to recapture the large amount of tax (approximately $100,-000) the Jacksons had paid as a result of the liquidation of Dr. Jackson's practice in Marblehead in 1982.

Despite the problem the Jacksons had with their 1974 tax shelter and despite warnings from both the IRS and Garfinkle about crack downs on tax shelters, the Jacksons, in less than six months, invested in three boats, an airplane and an interest in a New Jersey apartment building through loans from several lenders including Ganis. As summarized by Ganis in its post-trial brief, the Debtors' investments consisted of the following:

1. The "Starship"
In July, 1984, the Debtors signed a purchase and sale agreement for the purchase of a sailing vessel called the "Starship" for a price of $200,000. They obtained a loan from Delta Savings Association of Texas in the amount of $160,000 to finance that purchase.

2. J.E.I., Inc.
Also in July, 1984, the Debtors, through a newly-created, wholly-owned corporation, purchased an airplane for a price of $195,000, with financing from Key Capital Corporation.

3. The "Desiree"
In October, 1984, the Debtors signed a Purchase and Sale Agreement to purchase another boat, the "Desiree", for a price of $235,000. They obtained a loan from Carteret Savings and Loan Association in the amount of $188,000 to finance the purchase.

4. The "School Master"
In mid-December, 1984, the Debtors purportedly purchased a third boat, the "School Master", for a price of $500,000 and obtained a loan from Ganis in the amount of $405,600 to finance the purchase.

5. Starprop I Associates
In late December, 1984, the Debtors invested $133,000 in a limited partnership that owned an apartment building in New Jersey, with that purchase being financed by Midlantic Bank.

With respect to the "School Master" transaction, Ganis' president, Roger Kirwan, testified that he initially was approached by Stanley Brown, a former employee who was then president of Seagate, Inc. ("Seagate"). Seagate, a corporation based in League City, Texas, was engaged in generating, packaging and documenting marine loans. Seagate sent Ganis a number of documents relating to the Jacksons' financial condition, including a Seagate, Inc. secured credit application, an unsigned financial statement of the Jacksons and the Jacksons' 1981 through 1983 federal tax returns. Seagate also forwarded a loan application summary to Ganis.

Upon receipt of the documentation, Ganis conducted a credit investigation. However, Ganis never directly contacted the Debtors prior to disbursing the loan funds. According to Kirwin, Ganis verified the Debtors' employment and prepared an income analysis. Based upon its investigation, Ganis advised Seagate that it was prepared to make a loan in the amount of $405,600 toward the selling price of the boat, i.e., $500,000. Accordingly, Ganis obtained funds for the loan from the Citizens Valley Bank of Albany, Oregon. Ganis and Seagate also began preparing the additional documentation necessary to complete the transaction.

The first group of documents sent to Ganis by Seagate contained serious falsehoods. The Debtors' Application for Secured Credit shows a purchase price of $500,000 and a down payment of $110,000. The Debtors admit that they never made a down payment. The Debtors' personal fi-

nancial statement also is replete with errors. The financial statement reflects the existence of assets that the Debtors did not own, namely cash and notes receivables of $134,093 and an art and antique collection worth $192,700. Moreover, the financial statement fails to disclose liabilities incurred by the Debtors associated with their tax shelter investments.[1]

Among the documents prepared by Seagate, which was acting as Ganis' agent, was a Notice of Buyer Acceptance of Marine Vessel. Like the other documents just discussed, this document contains a serious misrepresentation. The Debtors, through this document, verified the condition and delivery of the "School Master." The notice that was signed by the Jacksons on December 13, 1984 provides:

> With reference to that certain Security Agreement dated December 15, 1984 between the undersigned and Ganis Corporation, 620 Newport Center Dr. Suite 524 Newport Beach, Ca. 92660 we hereby confirm that the Marine Vessel described herein has been properly delivered, is undamaged and in good working condition, meets all relevant specifications and expectations, and is hereby accepted without qualification by the undersigned.

The testimony at the trial revealed omissions and inaccuracies in the additional documentation necessary to complete the loan submitted to Ganis by Seagate. For example, the Builder's Certification is incomplete. Neither the "completion only" nor "entire construction" boxes are filled in. Moreover, the "year completed" spaces are blank, and the person completing the form failed to indicate the basis of his certification, i.e., whether he either personally performed the construction or whether he supervised the construction of the vessel on behalf of the builder, Trans/Carib Yachts, Inc.

Additionally, the marine insurance provided for the "School Master" provides: "Privilege granted for occasional charter with qualified captain in command of vessel; specifically, however, excluding charter on a per passenger and/or per diem basis." In view of the fact that the Application for Admeasurement indicates a commercial usage, and the parties contemplated that the vessel would be used entirely for charters, the documentation forwarded to Ganis by Seagate was internally inconsistent.

With respect to Ganis' reliance on the loan documentation, the parties devoted a considerable amount of trial time to the issue of the necessity of a marine survey. Ganis failed to obtain a marine survey, although in a December 14, 1984 memorandum Seagate indicated that such a document would be forwarded to Ganis in the future. Richard Tracy, an employee of Key Financial Corp. with over 14 years of marine lending experience, testified that such a survey was not required by marine lenders in 1984 for new vessels. Timothy McHugh, testified to the contrary.

Contrary to the representations in the Notice of Buyer Acceptance, the Debtors had never seen the boat. Indeed, the "School Master" was never more than an unfinished hull. However, neither Ganis nor the Jacksons learned this until it was too late. On December 21, 1984, after taking a $15,600 fee from the loan proceeds, Ganis, at the direction of the Debtors, mailed a check to Trans–Carib Yachts, Inc. at an address in Coral Gables, Florida. Trans–Carib was apparently an outfit in which Garfinkle was involved. Subsequently, in the middle of January, 1985, Ganis learned that its collateral was an aluminum hull, and the Jacksons learned Garfinkle was a convicted felon.[2]

---

1. Ganis, in response to the Debtors' observation that the financial statement forwarded to it was not signed, points out that a signed financial statement was submitted to Carteret Savings and Loan that shows the same nonexistent assets with the same values. Ganis, also points out that the Debtors never acquired title to the "Desiree" or the "Starship."

2. Garfinkle and others were indicted in November of 1980 for knowingly and willfully devising a scheme and artifice to defraud and obtain money and property by means of false and 'fraudulent pretenses, representations, and promises with respect to certain tax shelters.

Garfinkle, according to the Jacksons devised and arranged all aspects of their investments. Dr. Jackson testified that he and his wife were counseled by Garfinkle to sign copies of documents he sent to them in blank. According to Dr. Jackson, Garfinkle advised them that this procedure would permit Garfinkle to correct any errors or inaccuracies in the originals without troubling the Jacksons with additional requests to sign corrected documents. The Jacksons also testified that Garfinkle appeared to be quite successful and that they had no reason to suspect that he might be inserting false and misleading information in the documents they forwarded to him.

With respect to the Ganis transaction, Dr. Jackson testified that he had no clear recollection of what specific documents he and his wife signed. Accordingly, the Jacksons do not admit that they in fact made materially false representations. The Jacksons simply proceeded on the assumption that Garfinkle would take care of all the details associated with the tax shelter, including the financing, purchase, and use of the "School Master" for yacht charters.

## DISCUSSION

Two issues confront the Court: 1) Whether the Debtors made materially false representations with intent to defraud Ganis or with such reckless disregard for the truth that their actions were tantamount to fraud; and 2) Whether Ganis reasonably relied on the Debtors' materially false representations in extending credit to the Debtors.[3] However, as will become clear, resolution of the first issue may obviate the need to resolve the second.

Section 523(a)(2) of the Bankruptcy Code provides in relevant part:

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive....

11 U.S.C. § 523(a)(2) (West 1988).

As this Court stated in *In re Turner,* 23 B.R. 681 (Bankr.D.Mass.1982),

Section 523(a)(2)(A) require that for a debt to be held non-dischargeable the creditor must demonstrate that at the time the property was obtained:

1. the debtor obtained the property by means of false representations which he knew were false or which were made with reckless disregard for their truthfulness;

2. the debtor intended to deceive the creditor; and,

3. the creditor actually and reasonably relied on the misrepresentation.

*Id.* at 684. *See also Matter of Schnore,* 13 B.R. 249 (Bankr.W.D.Wis.1981). The false pretenses and false representations must involve moral turpitude or intentional wrong. Fraud implied in law is insufficient. *See* 3 Collier on Bankruptcy ¶ 523.08[4] (15th ed. 1988).

Like section 523(a)(2)(A), section 523(a)(2)(B) requires Ganis to demonstrate an intent to deceive on the part of the Debtors. Thus, for Ganis to prevail under either exception, it must prove that the Jacksons knowingly made false representations or made such representations so recklessly as to warrant the conclusion that the Debtors intended to deceive Ganis.

*See In re Hunter,* 780 F.2d 1577 (11th Cir.1986); *In re Kimzey,* 761 F.2d 421 (7th Cir.1985); *contra In re Ophaug,* 827 F.2d 340 (8th Cir.1987).

---

**3.** The Court notes that proof of the reasonableness of a creditor's reliance under 11 U.S.C. § 523(a)(2)(A) has led to conflicting opinions.

In *In re Roberts,* 82 B.R. 179 (Bankr.D. Mass.1987), the court discussed the requirement of intent to deceive under § 523(a)(2)(A) in a case where the debtor issued a check for more than $20,000 to pay for a car without first ascertaining that there were sufficient funds in the drawer's account. Noting that "the debtor was negligent to the point of recklessness in issuing the check", 82 B.R. at 183, the court held that "[i]ssuance of a check in reckless disregard of the balance in the account, but without intent to deceive, is not enough." *Id.* at 184 (citations omitted). The court went on to state:

> Statements made in reckless disregard of their truth, to be sure, can be some evidence of an intent to deceive, and such statements may well be sufficient of themselves for the fact finder to conclude that the party had the requisite intent. Thus in *In re Coughlin,* 27 B.R. 632 (1st Cir. BAP 1983), the former appellate panel of this Circuit ruled in the context of a § 523(a)(2)(B) action that a debtor's reckless completion and use of a financial statement containing material errors was sufficient evidence for the trial judge to conclude that he had an intent to deceive. *Coughlin* does not, however, remove the requirement that such intent be present. Intent must always be inferred from the totality of the circumstances.

*Id.* (citations omitted).

Ganis, on the one hand, views the Debtors as abjectly reckless. It refers to their investments strategy as "a six-month investment bonanza." It highlights the fact that the Debtors signed blank documents and did not stop once during their "investment spree" to consider the questionableness of their activities. Ganis describes as incredible the Jacksons' beliefs, which they now admit to be erroneous ones, that they could expect to reap considerable economic benefits without making down payments or incurring personal liability. In emphasizing its view that the Jacksons' conduct was so unbelievably reckless as to amount to fraud, Ganis also notes that Dr. Jackson's testimony and sworn statements are inconsistent with respect to the Jacksons' retention of Garfinkle as their attorney and financial advisor.

The Jacksons, on the other hand, portray themselves as innocent victims of a master white collar criminal. They note that they never received a dime as a result of the Ganis transaction. On the contrary, they point out that they have lost most of their assets, including their marital home. They admit that their conduct in failing to carefully review documents, in signing blank documents and in failing to retain an attorney to counsel them was stupid and careless. However, they argue that they had no reason to suspect Garfinkle whom they had known and trusted for many years prior to the Ganis transaction. Accordingly, they argue that Ganis has failed to meet its burden of proof on the issue of intent to deceive. The Court agrees.

Mindful that exceptions to discharge are to be construed strictly, *In re Hunter,* 780 F.2d 1577, 1579 (11th Cir.1986), the Court is unable to conclude from the evidence presented that Ganis proved that the Jacksons intended to deceive Ganis or acted so recklessly as to warrant such a finding.[4] The Court after hearing the testimony of both Debtors, is convinced that the Jacksons were victims as well as Ganis. Clearly, the Debtors' conduct in failing to accord the transaction in question the attention it warranted, in signing documents containing misrepresentations or blank documents, and in relying on Garfinkle to the exclusion of common sense is unforgiveable, but it does not rise to the level of fraud. The Court is persuaded by the Debtors' testimo-

---

4. The Court notes that in *In re Daboul,* 85 B.R 197 (Bankr.D.Mass.1988), the court held that the burden of proof for establishing fraud in both state and bankruptcy cases was the preponderance of the evidence standard. This Court has consistently held that the clear and convincing standard applies. The parties in their briefs have not made an issue of the applicable standard. For purposes of this opinion only and in recognition of the fact that "[v]ariations in the wording of the burden of proof ... [may be] ... pure abstractions unsuited to the realities of decisionmaking," 85 B.R. at 201, the Court will utilize the preponderance of the evidence standard.

ny that they had no reason to suspect Garfinkle. Although their conduct cannot be condoned, it is at least understandable since it was predicated on the advice of a trusted attorney and an accountant. The Court is convinced that the Debtors had every intention of repaying Ganis from the profits generated by charters of the "School Master." Moreover, the Court places little weight on the inconsistencies in Dr. Jackson's sworn statements in the light of all the other evidence.

In view of the Court's decision with respect to the issue of intent, resolution of the reliance issue is unnecessary. Accordingly, the Court hereby enters judgment for the Debtors and against Ganis on both counts of the complaint.