In re Diana BURWELL, Debtor.

Clyde–Findlay Area Cr. Union, Plaintiff,

v.

Diana Burwell, Defendant.

No. 01–3093.

United States Bankruptcy Court, N.D. Ohio.

Jan. 16, 2002.

Patti Baumgartner–Novak, Findlay, OH, for defendant.

C Drew Griffith, Toledo, OH, for plaintiff.

### DECISION AND ORDER

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court after a Trial on the Plaintiff's complaint to determine dischargeability. The statutory grounds for the Plaintiff's complaint rest solely upon the fraud exceptions to discharge contained in §§ 523(a)(2)(A) & (B) of the Bankruptcy Code; these sections provide, respectively, that:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive[.]

As it relates to the Plaintiff's complaint under these sections, the Court, based upon all of the evidence presented in this case, finds as follows:

In November of the year 2000, the Debtor, Diana Burwell (hereinafter referred to as the "Debtor") and her husband filed for divorce. As a part of their divorce proceedings—which from all appearances were quite contentious—the Debtor and her husband agreed to divide certain loan obligations for which both parties were liable. In accordance with this agreement, the Debtor, on December 5, contacted the Plaintiff and, after explaining the reason why, requested that the Plaintiff remove the Debtor's husband from two existing loan obligations. These two loan obligations consisted of a first loan in the amount of Ten Thousand Two Hundred Fifty-nine and 71/100 dollars ($10,259.71) which was partially secured against the Debtor's 1993 Jeep Cherokee, and a second loan for Five Thousand Three Hundred Twenty-two and 15/100 dollars ($5,322.15) which was completely unsecured. At the time the Debtor applied for this refinancing, she had been employed for approximately eight months with the "Budd Co." In this capacity, the Debtor earned Eleven and 50/100 dollars ($11.50) per hour.

On December 8, 2000, the Plaintiff, after conducting a credit investigation, agreed to remove the Debtor's husband from the two existing loan obligations. A new agreement was then executed in which the Debtor, in her sole capacity, agreed to pay the Plaintiff on the new loan obligations starting in January of 2001. With regards to this transaction, it was stipulated that no new funds were received by the Debtor; instead, the sole change made to the existing two loan obligations was to remove the Debtor's husband, as a named obligor, therefrom.

On January 9, 2001, the divorce between the Debtor and her husband was finalized. At this same time, the Debtor also contacted an attorney regarding possibly filing for bankruptcy. According to the Debtor, such a course of conduct was potentially needed because shortly after Christmas she had learned that the Budd Co. would be potentially laying off a number of people for an indefinite period of time. Further, according to the Debtor, her financial condition was being exacerbated by two additional factors. First, the Debtor related to the Court that shortly after she had refinanced her loans with the Plaintiff, she was forced to move out of her mother's house, which resulted in her monthly rental payments increasing from Two Hundred dollars ($200.00) to Four Hundred Fifty dollars ($450.00). Second, it was brought to the Court's attention that the Debtor was not receiving any child support from her ex-husband for the parties' minor child.

On January 26, 2001, the Debtor's concerns involving her job were realized when she was laid off from the Budd Co.; at this

time, the Debtor was not informed when and if she would be recalled to her job. Four days thereafter, the Debtor, who had yet to make a payment on her loan obligations to the Plaintiff, filed a petition in this Court for relief under Chapter 7 of the United States Bankruptcy Code. Excluding those obligations owed to the Plaintiff, the Debtor, in her bankruptcy petition, listed only Nine Hundred dollars ($900.00) in secured debt and One Thousand Seven Hundred Fifty-five and 38/100 dollars ($1,755.38) in unsecured debt; the Debtor's total assets were listed at Four Thousand Six Hundred Thirty dollars ($4,630.00). Approximately two weeks after filing for bankruptcy relief, the Debtor obtained a full-time job earning Nine dollars ($9.00) per hour. The Debtor, however, quit this job in April of 2001 when she was called back to her job at the Budd Co.

## LEGAL ANALYSIS

The Plaintiff in this case seeks a determination that those debts which were incurred by the Debtor when she refinanced her loans with the Plaintiff are nondischargeable pursuant to either of the fraud exceptions to discharge set forth in § 523(a)(2). As resolution of this matter involves a determination as to the dischargeability of a particular debt, this matter is a core proceeding over which the Court has the authority to enter final orders. 28 U.S.C. § 157(b)(2)(I).

Sections 523(a)(2)(A) and 523(a)(2)(B) of the Bankruptcy Code implement the long standing Congressional policy that a debtor who incurs a debt through fraudulent means is not, with respect to that particular debt, entitled to the benefits of a bankruptcy discharge. *Bernard Lumber Co. v. Patrick (In re Patrick)*, 265 B.R. 913, 916 (Bankr. N.D.Ohio 2001). Although § 523(a)(2)(A) and § 523(a)(2)(B) apply under slightly dif-

ferent circumstances— § 523(a)(2)(A) expressly excludes oral statements respecting the debtor's financial condition, while § 523(a)(2)(B) requires a statement respecting a debtor's financial condition that is in writing—both sections require that a common element be established before a finding of nondischargeability will be entered: The debtor must have made a false statement/representation with the intention of deceiving the creditor. *Household Fin. Corp. v. Howard (In re Howard)*, 73 B.R. 694, 702 (Bankr.N.D.Ind.1987); *Ganis Corp. v. Jackson (In re Jackson)*, 89 B.R. 308, 312 (Bankr.D.Mass.1988). In line with the policy of narrowly construing exceptions to discharge, the burden to establish this requirement is placed upon the party challenging the dischargeability of the debt. *See, e.g., Griffith, Strickler, Lerman, Solymos & Calkins v. Taylor (In re Taylor)*, 195 B.R. 624, 627 (Bankr.M.D.Pa. 1996).

For purposes of §§ 523(a)(2)(A) and (B), a debtor will be found to have acted with the requisite intent to deceive a creditor when the debtor, at the time the debt was incurred, had no intention of paying the debt in full. *See In re Patrick*, 265 B.R. at 916. As would be expected, however, rarely, if ever, will a debtor ever admit to acting in such a manner. As a result, a party seeking to establish a debtor's fraudulent intent may rely on circumstantial evidence relating to the debtor's state of mind at the time of the alleged fraud. *ITT Financial Services v. Torres (In re Torres)*, 139 B.R. 659, 662 (Bankr. N.D.Ohio 1991) (interpreting § 523(a)(2) (B)); *In re Patrick*, 265 B.R. at 916. Such circumstantial evidence may include not only the debtor's conduct at the time of the representations, but may also include any subsequent conduct, to the extent that such conduct provides an indication as to the debtor's state of mind at the time of

the actionable representations. *Groetken v. Davis (In re Davis)*, 246 B.R. 646, 652 (10th Cir. BAP 2000). Once such evidence is produced, a bankruptcy court is then to consider whether the circumstances, as viewed in the aggregate, present a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor. *Id.*

■ In support of its position that the Debtor acted with the intent to defraud, the Plaintiff's case relies primarily on the timing of certain events. (Plaintiff's Pre-Trial Memorandum, at pg. 4). In particular, the Plaintiff calls this Court's attention to the fact that approximately four weeks after refinancing her loans with the Plaintiff, the Debtor contacted an attorney regarding filing for bankruptcy. Further, according to the Plaintiff, any inference of fraud which arises therefrom is strengthened by the fact that not long thereafter, the Debtor did in fact file for bankruptcy relief.

On its face, the points raised by Plaintiff establish a strong inference of fraudulent intent as one of the traditional badges of fraud is the general chronology of events. *See Crews v. Stevens (In re Stevens)*, 250 B.R. 750, 755 (Bankr.M.D.Fla.2000) (applying fraud standard under § 727(a)). In this respect, (and as the Plaintiff argues) an analysis under § 523(a)(2) is very often concerned with these particular events: (1) the date on which the debt is incurred; (2) the date on which the debtor first seeks legal advice concerning his financial problems; and (3) the date on which the debtor actually files for bankruptcy relief. In addition, and further lending support to the Plaintiff's position, the Court takes note of the fact that at no time did the Debtor even attempt to set up some sort of payment arrangement with the Plaintiff. In fact, it does not appear that the Debtor even considered this a viable option as the Debtor filed for bankruptcy just four days after being laid off from the Budd Co. This fact is especially disconcerting when one considers that the Plaintiff was by far the Debtor's largest creditor; thus if some sort of an arrangement could have been reached, the Debtor could have avoided bankruptcy altogether.

The above set of circumstances, however, must be set against other factors which would tend to indicate that the Debtor's bankruptcy was driven not by fraud, but instead by other extraneous concerns—i.e., the Debtor being laid off her job. For example, the Court observes the Debtor only contacted an attorney concerning the possibility of filing for bankruptcy after she discovered that her employer would be potentially laying off a number of its employees. Of equal importance, the Debtor did not actually file for bankruptcy until after she was, in fact, laid off her job. Additionally, the Court observes that after refinancing her loans with the Plaintiff, the Debtor incurred an additional expense in the form of higher rent after she was forced to leave her mother's house. While this increase in rent does not appear to the primary force behind the Debtor's bankruptcy petition, such a fact does lend credence to the deteriorating financial condition which was confronting the Debtor after she had refinanced her loans with the Plaintiff.

However, what this Court finds most telling regarding the lack of fraudulent intent on the part of the Debtor is that the Debtor never obtained any monetary benefits by refinancing her loans with the Plaintiff. In fact, the only party to benefit monetarily by the Debtor's refinancing was the Debtor's ex-husband who had his legal liability on the loans removed. In this Court's judgment, this lack of any monetary gain on the part of the Debtor tips the balance against a finding of fraudulent intent. In coming to this conclusion, the Court recognizes that monetary bene-

fits are not, under all circumstances, the only thing that would cause a person to commit an act of fraud. Along this line, the Court observes that in this case the Debtor did receive an indirect benefit by refinancing her loans with the Plaintiff; specifically, the refinancing appears to have helped facilitate the divorce proceedings between the Debtor and her ex-husband. However, given the contentious nature of the Debtor's divorce, it seems highly unlikely that the Debtor would have intentionally defrauded herself when the primary beneficiary of such a fraud would have been the Debtor's soon to be ex-husband. In this same regard, two related points are also relevant. First, no evidence of collusion between the Debtor and her ex-husband was put forth. Second, at the time the Debtor refinanced her loans, the Plaintiff was made fully aware of the Debtor's pending divorce. Therefore, for these reasons, the Court finds that, although certain inferences of fraud do exist in this case, the primary impetus for the Debtor's bankruptcy was the occurrence of events that took place after the Debtor refinanced her loans with the Plaintiff. As such, for purposes of both § 523(a)(2)(A) and § 523(a)(2)(B), the Court cannot find that the Debtor acted with the intent to defraud the Plaintiff.

In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Decision.

Accordingly, it is

**ORDERED** that the obligations of the Defendant/Debtor, Diana Burwell, to the Plaintiff, Clyde–Findlay Area Credit Union, be, and are hereby, determined to be DISCHARGEABLE DEBTS.