**In re Jacqueline DELISLE, Debtor.**

**Alexander Staniunas, Plaintiff,**

v.

**Jacqueline Delisle, Defendant.**

**Bankruptcy No. 01–45192.**
**Adversary No. 01–4391.**

United States Bankruptcy Court,
D. Massachusetts,
Western Division.

Aug. 8, 2002.

Michael C. Najjar, Marcotte Law Firm, Lowell, MA, Jon H. Kurland, Kurland & Grossman, P.C., Chelmsford, MA, for debtor.

Jay P. Sheehan, Pelham, NH, for plaintiff.

## *MEMORANDUM OF DECISION*

JOEL B. ROSENTHAL, Bankruptcy Judge.

The Court has before it an Adversary Proceeding filed by Alexander Staniunas (the "Plaintiff") against Jacqueline Delisle (the "Debtor") seeking to except from discharge certain money the Plaintiff alleges is owed by the Debtor pursuant to 11 U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 523(a)(4) and seeking to deny the Debtor a discharge pursuant to 11 U.S.C. § 727(a)(2)(A).

The Court held an evidentiary hearing and has reviewed the arguments of counsel, both written and oral, as well as the entire record of the case, including affidavits and exhibits, and based upon such review, including and for the following reasons, overrules the objection to dischargeability pursuant to Section 523(a)(2)(A) as to the $35,000 transaction and the objection to dischargeability pursuant to Section 523(a)(4) as to the $45,000, overrules the objection to discharge pursuant to Section 727(a)(2)(A), and sustains the objection to

dischargeability of the $45,000 transaction pursuant to Section 523(a)(2)(A).

## I. BACKGROUND

The Plaintiff, an elderly man,[1] met the Debtor [2] in June 1998, when, the Plaintiff responded to the Debtor's advertisement seeking to rent a house for herself and her minor son. The Debtor agreed to rent a house from the Plaintiff and in late June or early July 1998, the Plaintiff routinely gave the Debtor money to purchase items to prepare the house.[3] The Plaintiff and the Debtor developed a friendship. He would visit the Debtor two to three times a week at the her Lowell apartment [4] with the Debtor's mother, Ruth Delisle, usually present.[5] The Debtor and the Plaintiff would frequently go out to eat together.

On July 17, 1998, the Plaintiff opened a joint savings account in both his and the Debtor's name (the "joint account") at the Andover Bank in Methuen, Massachusetts and deposited $85,000 into the account. Shortly thereafter, the Plaintiff went to the Debtor's residence in Lowell to obtain her signature on the signature card of the joint account. When the Plaintiff arrived at the apartment, the Plaintiff, the Debtor, and the Debtor's mother met in the kitchen.[6] The Debtor's mother testified that she advised her daughter against being a party to the joint account. The Debtor, however, ignored her mother's advice. After the Debtor signed the signature card, the Plaintiff took it and subsequently returned it to the bank. The Plaintiff claims that he thereafter kept the passbook in his possession while the Debtor and her mother claim that he gave the passbook to the Debtor. According to the Plaintiff, this account was opened with the understanding that it would be used by the Debtor for the Plaintiff's care in case his health deteriorated and he needed access to money.[7] The Debtor, on the other hand, claims that this account was opened for her to use for whatever she wanted and for the Plaintiff's care in the event something happened to him.

Simultaneously the Debtor's car began giving her problems and she asked the Plaintiff to assist her in purchasing a new one. On July 31, 1998, the Debtor, with the Plaintiff's permission, withdrew $35,000 [8] from the joint account to purchase a 1998 Chevrolet Truck from a New Hampshire dealership. The Debtor purchased the truck for $28,828 and used a little over $6,000 for additional accessories. The Plaintiff claims that there was an oral agreement that the $35,000 was a loan to be repaid in $100 monthly installments and

---

1. The Plaintiff's date of birth is August 12, 1918, and he was eighty years old when he met the Debtor.

2. The Debtor's date of birth is January 8, 1974, and she was twenty-four years old when she met the Plaintiff.

3. The Debtor performed duties around the house such as cleaning, stripping wallpaper, patching holes, and painting.

4. The Debtor was renting an apartment in Lowell, Massachusetts when she first met the Plaintiff and actually remained in such apartment since she never moved into the Plaintiff's house.

5. The Debtor testified that she felt uncomfortable being alone with the Plaintiff in her apartment, therefore, she routinely asked her mother to be present during his visits.

6. The exact date of this meeting is unknown. There was testimony that the meeting occurred a couple of days after the joint account was opened.

7. During the testimony, the Plaintiff repeatedly stated that the account was opened so that the Debtor could serve as his "homemaker".

8. The Debtor withdrew $28,023 in the form of a bank check and the rest in cash.

the Debtor claims that it was a gift. On November 24, 2000, the Debtor traded the truck for a mini-van and $9,000 in cash.

In early August 1998, the Plaintiff asked the Debtor if she would give him "some loving." The Plaintiff was embarrassed about this and immediately asked for her forgiveness. On August 13, 1998, the Plaintiff was admitted to the Lowell General Hospital for what was originally suspected to be a minor heart attack. While in the hospital, the Plaintiff requested that the Debtor retrieve a plastic bag containing the joint account passbook, along with other items, from his car. According to the Plaintiff, he looked inside the bag the next day after he was released from the hospital and discovered that the joint account passbook was missing. According to him, after inquiring about it, the Debtor informed him that it had fallen out of the bag but she picked it up and kept it in her possession.[9]

On August 20, 1998, the Debtor withdrew $45,000 from the joint account and on the same day deposited the entire amount into her personal account at Fleet Bank in Dracut, Massachusetts. The Debtor claims that she did this at the Plaintiff's direction while the Plaintiff claims that she took the funds without his permission.

Shortly thereafter, the Debtor decided that she did not want to rent the Plaintiff's house but instead wanted to purchase it. She asked the Plaintiff to finance the purchase. According to the Plaintiff, he agreed because he hoped that he would get his money back. After the Debtor had the house inspected on September 8, 1998, she discontinued all contact with the Plaintiff. The Debtor claims that the reason for her change of heart was because the Plaintiff

insisted on having a room in the house and requested that she not have any boyfriends visit her there.

On May 2, 2000, the Plaintiff filed a Complaint[10] against the Debtor in the Middlesex Superior Court alleging that the Debtor failed to make the truck loan payments and that she fraudulently converted funds from the joint account. On December 14, 2000, the Massachusetts Superior Court (Hinkle, J.) granted a default judgment for the Plaintiff and ordered the Debtor to pay the Plaintiff $80,000 plus interest of $5,893.60. The Debtor unsuccessfully sought to vacate the default judgment and the matter is currently on appeal at the Massachusetts Appeals Court.

On August 16, 2001, the Debtor filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code (the "Bankruptcy Code" or the "Code"). Thereafter the Plaintiff filed an Adversary Proceeding against the Debtor alleging that the debts are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) [Count I] and 11 U.S.C. § 523(a)(4) [Count II], and that the Debtor's discharge should be denied pursuant to 11 U.S.C. § 727(a)(2)(A) [Count III]. After the trial, this Court took the matter under advisement.

## II. DISCUSSION

### A. Collateral Estoppel

 The Plaintiff argues that the state court's default judgment should have collateral estoppel effect in these bankruptcy proceedings. Collateral estoppel principles apply in dischargeability proceedings. *Grogan v. Garner*, 498 U.S. 279, 284, 111 S.Ct. 654, 658, 112 L.Ed.2d 755 (1991). Collateral estoppel applies when:

---

**9.** The Debtor claims that she had possession of the passbook since the meeting in the kitchen.

**10.** The Complaint was based on Breach of Contract (Count I), Conversion (Count II), and Restitution (Count III).

(1) the issue sought to be precluded is the same; (2) the issue was actually litigated; (3) the issue was determined by a valid and final judgment; and (4) the determination was essential to the judgment. *Henderson v. D'Annolfo (In re D'Annolfo),* 54 B.R. 887, 889 (Bankr.D.Mass.1985) (citation omitted). The principle of collateral estoppel is not applicable to the case at bar, however, because the prior state court proceeding involved a default judgment and, accordingly, the issues were not actually litigated. See *Commonwealth of Massachusetts v. Hale,* 618 F.2d 143, 146 (1st Cir.1980) (citations omitted); *Treglia v. MacDonald,* 430 Mass. 237, 242, 717 N.E.2d 249, 253 (1999).

In *Phalon v. Varrasso (In re Varrasso),* 194 B.R. 537 (Bankr.D.Mass.1996), a case with a state court procedural history similar to this case, Judge Kenner addressed whether a judgment entered by default satisfies the second prong. In that case, the defendant did not answer the complaint, the court entered default, and assessed damages pursuant to Mass.R.Civ.P. 55(b)(2).[11] The *Varrasso* court found that when a judgment enters default, the issues raised by the complaint are not actually litigated, such that the judgment can have no preclusive effect in subsequent proceedings. *Id.* at 539; *Treglia,* 430 Mass. at 242, 717 N.E.2d at 253 (default judgment does not have preclusive effect on an issue in a subsequent action because the issues have not been actually litigated); Restatement (Second) of Judgments, § 27 comment (in the case of a judgment entered by default, none of the issues is actually litigated, therefore, the judgment should not have preclusive effect).

Accordingly, the state court judgment does not have collateral estoppel effect in these bankruptcy proceedings.

## B. The Truck Purchase

▮▮▮ The Plaintiff argues that the Debtor fraudulently obtained the $35,000 for the truck's purchase and, therefore, such debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). Section 523(a)(2)(A) excepts from discharge a debt for "money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—false pretenses, a false representation, or actual fraud ..." 11 U.S.C. § 523(a)(2)(A). The elements of proof required under Section 523(a)(2)(A) are well established in this circuit:

> [I]n order to establish that a debt is nondischargeable because obtained by 'false pretenses, a false representation, or actual fraud,' ... a creditor must show that 1) the debtor made a knowingly false representation or one made in reckless disregard of truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor's actually relied upon the misrepresentation, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage.

*McCrory v. Spigel (In re Spigel),* 260 F.3d 27, 32 (1st Cir.2001) (citation omitted). The party seeking to except the debt from discharge bears the burden of proving each element of the exception by a preponderance of the evidence. *Id.* at 32. If a plaintiff fails to establish any one of the elements by a preponderance of the evidence, the claim under Section 523(a)(2)(A) must be rejected. See *Palmacci v. Umpierrez,* 121 F.3d 781, 787 (1st Cir.1997).

---

11. This rule gives the state court authority to conduct a hearing on assessment of damages when default enters.

■ The Plaintiff argues that the Debtor misrepresented that she was a close friend who would take care of him, he relied on this misrepresentation, and as a result of such reliance suffered damages by loaning her money that she had no intention of repaying. There is no dispute that the Debtor withdrew $35,000 from the joint account and used it to purchase a new truck. However, the Plaintiff argues that the $35,000 was a loan to be repaid in $100 monthly installments until the total amount was paid off and the Debtor argues that the $35,000 was given to her as a gift.

There is no evidence that the Plaintiff loaned the Debtor the $35,000; there were no loan documents and the Plaintiff's name does not appear on the title to the truck. It appears that the $35,000 was a form of a gift to the Debtor because the Plaintiff took an interest in this young mother and wanted to help her out. Although it may not have been wise on the Debtor's part to accept such an expensive gift from an elderly man she recently met, there is no indication that it was a loan. However, even if the $35,000 was a loan rather than a gift, it is unsecured and dischargeable. See *Farina v. (In re Balzano)*, 127 B.R. 524, 530 (Bankr.E.D.N.Y.1991) ("A bare promise to be fulfilled in the future, which is not carried out, does not render a consequent debt nondischargeable under § 523(a)(2)(A).").

Accordingly, the Plaintiff's objection to dischargeability pursuant to Section 523(a)(2)(A) of the $35,000 used to purchase the truck is overruled.

## C. Transfer of the Truck Within One Year of the Petition Date

■ The Plaintiff argues that the Debtor transferred her interest in the truck and did not report it in her schedules and, therefore, her discharge should be denied pursuant to Section 727(a)(2)(A) of the Code. This Section of the Code provides that:

> The court shall grant the debtor a discharge, unless—the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, mutilated, or concealed—property of the debtor, within one year before the date of the filing of the petition.

11 U.S.C. § 727(a)(2)(A). Accordingly, in order to support a claim for the denial of discharge under Section 727(a)(2)(A) four elements must be proven: (1) a transfer of property, (2) belonging to the debtor, (3) within one year of the filing of the bankruptcy petition, and (4) with the intent to hinder, delay, or defraud a creditor. *Annino, Draper & Moore v. Lang (In re Lang)*, 246 B.R. 463, 467–68 (Bankr. D.Mass.2000) (citation omitted). The Plaintiff bears the burden of establishing each element by a preponderance of the evidence. *Id.* at 468; *Rhode Island Depositors Econ. Protection Corp. v. Hayes (In re Hayes)*, 229 B.R. 253, n. 7 (1st Cir. BAP 1999); *Xerox Fin. Servs. Life Ins. Co. and Van Kampen Merritt v. Sterman (In re Sterman)*, 244 B.R. 499, 504 (D.Mass.1999).

■ Given the serious nature of a discharge denial, the reasons for denying a discharge " 'must be real and substantial, not merely technical and conjectural.' " *In re Sterman*, 244 B.R. at 504 (citation omitted). "In light of the effect on the [d]ebtor, a denial of discharge is an extreme step that should not be taken lightly ... and, therefore, the provisions of § 727 should be construed liberally in favor of debtors." *In re Lang*, 246 B.R. at 468 (citations omitted). Objections to discharge " 'are

narrowly construed in furtherance of the Bankruptcy Code's "fresh start" policy and the claimant must show that its claim comes squarely within an' objection enumerated in Bankruptcy Code § 727(a)(2).' " *Small v. Bottone (In re Bottone),* 209 B.R. 257, 262 (Bankr. D.Mass.1997) (citations omitted). The policy of providing the debtor with a fresh start is balanced against treating creditors fairly. " 'The very purpose of certain sections of the law, like [§ 727(a)(2)], is to make certain that those who seek the shelter of the Bankruptcy Code do not play fast and loose with their assets or with the reality of their affairs.' " *In re Lang,* 246 B.R. at 468 (citation omitted).

In the case at bar, the first three elements of Section 727(a)(2)(A) are present. On November 24, 2000, less than a year before the petition date, the Debtor transferred her interest in the truck in exchange for another motor vehicle and cash, and failed to disclose such transfer on her petition. The only issue left to determine is whether the Debtor intended to hinder, delay, or defraud a creditor by not listing the transfer on her petition. The Plaintiff must show the Debtor's actual, rather than constructive, intent to hinder, delay, or defraud. *In re Lang,* 246 B.R. at 468 (citations omitted).

■■■■■ Since "no debtor will admit to an improper intent[,] [t]he Court must … consider the surrounding facts and circumstances and draw inferences of a debtor's actual intent from that debtor's actions." *Id.* at 469 (citations omitted). Courts have looked at the so-called "badges of fraud" which include: "(1) the lack of or inadequacy of consideration for the transfer; (2) the existence of a family, friendship, or special relationship between the parties; (3) an attempt by the debtor to keep the transfer secret; (4) the financial condition of the party sought to be charged both

before and after the transaction; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the overall chronology of events and transactions." *Id.* at 469 (citations omitted).

■■■■ There are no "badges of fraud" present in this case and there is no evidence that the transfer was made with the intent to hinder, delay, or defraud a creditor. First, there is nothing suspect about the timing of the filing; the Debtor filed for bankruptcy nine months after the transfer was made. Second, the transfer was made before the state default judgment was entered, therefore, no inference could be made that the transfer was made to avoid attachment of the truck. Third, there is no evidence of inadequate consideration. Fourth, the transfer was not made to a family member or friend. Fifth, there is no evidence that the failure to disclose the transfer was a result of the Debtor's attempts to keep the transfer secret. Lastly, there was testimony that the Debtor lost her job one month prior to the transfer, therefore, an inference could be made that she sold the truck because she needed money to provide for herself and her child.

Accordingly, this Court finds that the Debtor's omission of the truck transfer was not done with the intent to hinder, delay, or defraud, and, therefore, overrules the Plaintiff's objection to discharge pursuant to Section 727(a)(2)(A).

*D. Withdrawal of $45,000 from the Joint Account*

*1. Section 523(a)(4)*

The Plaintiff argues that the Debtor fraudulently obtained the $45,000 while acting in a fiduciary capacity and that such

debt should be nondischargeable pursuant to 11 U.S.C. § 523(a)(4). Section 523(a)(4) excepts from discharge a debt obtained by "fraud or defalcation while acting in a fiduciary capacity ..." 11 U.S.C. § 523(a)(4).

▮▮▮ The first issue that needs to be determined is whether the Debtor was acting in a fiduciary capacity.[12] Federal law controls who is a fiduciary for purposes of Section 523(a)(4). *Kwiat v. Doucette*, 81 B.R. 184, 188 (D.Mass.1987). Section 523(a)(4), as with all other discharge statutes, is construed narrowly to further the fundamental policy of the Bankruptcy Code of providing the debtor with a fresh start. *Collenge v. Runge (In re Runge)*, 226 B.R. 298, 304 (Bankr.D.N.H.1998) (citations omitted). To be a fiduciary for dischargeability purposes, the debtor must be a trustee either under an express or "technical" trust, *id.* citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934), and the trust relationship must exist prior to the act creating the debt.[13] *Kwiat*, 81 B.R. at 188.

▮▮▮ An express trust has been defined as a "fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it." *Shea v. Goldstein (In re Goldstein)*, 234 B.R. 214, 220 (Bankr. D.Mass.1999), citing Restatement (Second) of Trusts § 2 (1959). An express trust "requires a declaration of trust and intent to create a trust relationship with respect to a clearly defined res." *Stowe v. Bologna (In re Bologna)*, 206 B.R. 628, 632

(Bankr.D.Mass.1997). There is no evidence of the existence of an express trust in this case.

▮▮▮ A technical trust is " 'a trust that is imposed by law and may arise either by statute or common law.' " *In re Runge*, 226 B.R. at 305. If a state statute is at issue, the statute " 'must define the trust res, spell out the trustee's fiduciary duties and impose a trust prior to and without reference to the wrong which created the debt.' " *Santa v. Lebner (In re Lebner)*, 197 B.R. 180, 190 (Bankr.D.Mass. 1996) (citation omitted). In determining whether a technical trust relationship exists, courts have consistently considered state law relevant in determining whether a debtor was acting as a fiduciary under the Bankruptcy Code. "Statutorily created 'trusts' create fiduciary duties that are dependent upon the relationship between the parties, but are not created by agreement of the parties nor created ex post facto as a remedial measure to right a wrong." *Brixius v. Christian (In re Christian)*, 172 B.R. 490, 495 (Bankr.D.Mass.1994) (abrogated on other grounds) (citations omitted). The Plaintiff must point to an express legislative design to create a trust relationship. *Id.* There is no Massachusetts statute, nor does the Plaintiff point to one, governing whether a fiduciary duty exists in situations similar to the case at bar-where someone opens up a joint account with a third party so that such party could serve as his "homemaker".

At best, there was an implied or constructive trust, which is insufficient for the creation of a fiduciary relationship under Section 523(a)(4).[14] See *In re Frain*, 230

---

**12.** Examples of fiduciary relationships include lawyer-client, director-shareholder, or managing partner-limited partner.

**13.** The Plaintiff does not state what type of trust he believes existed.

**14.** An implied or constructive trust is different from a "technical" trust because the latter is created by statute or common law and the former is not.

F.3d 1014, 1017 (7th Cir.2000); *In re Bologna*, 206 B.R. at 632. Black's Law Dictionary (Seventh Edition) defines a constructive trust as a "trust imposed by a court on equitable grounds against one who has obtained property by wrongdoing, thereby preventing the wrongful holder from being unjustly enriched."

Accordingly, Section 523(a)(4) of the Code is inapplicable to the case at bar; a fiduciary relationship did not exist between the parties because there is no evidence of an express or technical trust. See *Stentz v. Stentz (In re Stentz)*, 197 B.R. 966 (Bankr.D.Neb.1996) (the court found no fiduciary relationship between father and son where joint account was opened, son had a Power of Attorney and took care of his father's medical needs).

*2. Section 523(a)(2)(A)*

■ The Plaintiff additionally argues that the $45,000 is nondischargeable pursuant to Section 523(a)(2)(A). Section 523(a)(2)(A) excepts from discharge a debt for "money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—false pretenses, a false representation, or actual fraud ..." 11 U.S.C. § 523(a)(2)(A). The Plaintiff must prove by a preponderance of the evidence every element of Section 523(a)(2)(A). The Plaintiff must show that 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the misrepresentation, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage. *In re Spigel*, 260 F.3d at 32 (citation omitted).

There was no evidence that the Debtor fraudulently induced the Plaintiff into opening the joint account so that she could later take the money. As a matter of fact, the Plaintiff and the Debtor both testified that the Debtor did not know about the joint account until a few days *after* it was opened. However, the question is once the account was opened, did the Debtor fraudulently withdraw the $45,000 from the account?

■ All parties to a joint account have the legal right to withdraw all or part of the funds. *Heffernan v. Wollaston Credit Union*, 30 Mass.App.Ct. 171, 177, 567 N.E.2d 933, 937 (1991); Mass.Gen.Laws Ch. 167D, § 5 ("[A]ny part or all of the deposits and interest represented by the joint account may be withdrawn, assigned or transferred in whole or in part by any of the individual parties."). However, this legal right to withdraw pertains to the rights of the parties vis-a-vis the bank; the parties to the account may have an agreement among themselves that is separate and apart. See *Bradford v. Eastman*, 229 Mass. 499, 500–501, 118 N.E. 879 (1918) (funds in joint account of niece and aunt did not belong to niece because the account was opened in the niece's name with the understanding that the niece would only withdraw money from the account at the aunt's direction while the aunt was out of the country); *Ball v. Forbes*, 314 Mass. 200, 203–204, 49 N.E.2d 898, 900 (1943).

■ "The determination of the interest the [parties have] in the deposits in the joint accounts is dependent primarily on what their intention was, and that is a question of fact." *Buckley v. Buckley*, 301 Mass. 530, 531, 17 N.E.2d 887, 888 (1938) (citations omitted); See also *United States v. U.S. Currency*, 189 F.3d 28, 33 (1st Cir.1999). It is permissible to prove by oral evidence the purpose by which a joint account was established. *Burns v. Paquin*, 345 Mass. 329, 331, 187 N.E.2d 139, 141 (1963) (citations omitted).

In the present case, there is credible evidence that the parties had an agreement that the funds in the account were to be used by the Debtor for her personal use and for the Plaintiff's care if his health deteriorates and that in either event, prior to withdrawing such funds, the Debtor was required to obtain the Plaintiff's permission. See *Buckley*, 301 Mass. at 531, 17 N.E.2d 887 (the court found that there was an agreement between the joint owners, husband and wife, that the deposits were to be subject to withdrawal by the wife only for ordinary household requirements and if anything happened to the husband the wife could have available to her the entire amounts for her own). It is because of this agreement between the parties that the Plaintiff accompanied the Debtor to withdraw the money for the truck's purchase.

No reasonable person would believe that an eighty-year-old man, with potentially failing health, would grant a gift of tens of thousands of dollars to someone he had known for less than 30 days. Additionally, the fact that the Debtor withdrew the $45,000 from the joint account and transferred the entire amount into her personal account leads to the conclusion that the Debtor was attempting to conceal the funds from the Plaintiff. See *In re Stentz*, 197 B.R. at 982 (finding that son's withdrawal of money from joint account was not fraudulent because his actions were not concealed). The Debtor claims that the transfer was made at the Plaintiff's request because he wanted the monies to be closer in proximity to where the Debtor lived. At that time, the Debtor lived in Lowell, the joint account was in Methuen, and her personal account was in Dracut; the difference in distance of each bank to the Debtor's residence is nominal. The Court does not find this explanation credible.

Accordingly, this Court finds that the $45,000 was an unauthorized withdrawal by the Debtor. The Plaintiff's objection to dischargeability of the $45,000 pursuant to Section 523(a)(2)(A) is, therefore, allowed because such funds were fraudulently obtained.

### III. CONCLUSION

For the foregoing reasons, this Court overrules the objection to dischargeability pursuant to Section 523(a)(2)(A) as to the $35,000 transaction and the objection to dischargeability pursuant to Section 523(a)(4) as to the $45,000, overrules the objection to discharge pursuant to Section 727(a)(2)(A), and sustains the objection to dischargeability of the $45,000 transaction pursuant to Section 523(a)(2)(A).