**In re Gary G. GRIM, d.b.a. G.F.S. Marketing Group, Debtor.**

**Pamela Graffice, Plaintiff,**

**v.**

**Gary G. Grim, d.b.a. G.F.S. Marketing Group, Defendant.**

**Nos. 01–3156, 01–31676.**

United States Bankruptcy Court, N.D. Ohio.

Feb. 5, 2003.

158

Samuel B. Morrison, Toledo, OH, for Plaintiff.

Stephen R. Archer, Defiance, OH, for Defendant.

## MEMORANDUM OPINION AND DECISION

RICHARD L. SPEER, Bankruptcy Judge.

In the instant case, the Plaintiff, as executrix of her deceased parents' estate, seeks a determination that a certain business investment placed with the Defendant is a nondischargeable debt. On October 29, 2002, a Trial was held on this matter. At the conclusion of this Trial, the Court permitted the Parties to file Post–Trial Briefs, which both the Parties have now done. After reviewing these briefs, together with all of the evidence presented in this case, the Court, for the reasons that will now be explained, finds that the debt at issue is Dischargeable under bankruptcy law.

### FACTS

For the past 33 years, the Defendant, Gary Grim (hereinafter "Defendant") who is a licensed Charted Life Underwriter, has been engaged in the business of selling insurance and other related investment opportunities. In 1998, during the course of his business activities, the Defendant saw an advertisement in an insurance trade magazine to sell an investment product issued by Alliance Leasing, Inc. (hereinafter "Alliance"). This advertisement had been placed by Mr. Scott Regal who was the regional sales manager for Pioneer Leasing (hereinafter "Pioneer"). The nature of the investment product offered by Alliance concerned office equipment that would be ostensibly sold to investors who, in turn, would give the equipment back to Alliance for leasing to other companies. For the investor, the promised rate of return was 28% over a term of 25 months. The investment itself, however, unlike the office equipment which was covered by an indemnity policy, was not insured.

After contacting the Better Business Bureau and finding no negative indicators against Alliance, the Defendant responded to Alliance's advertisement. Thereafter, upon taking a course and a subsequent examination, the Defendant was permitted to sell Alliance's investment product. As a salesman, the Defendant worked entirely on commission, receiving 10% of the proceeds he solicited from investors. (Defendant's Exhibit # 4). Although not licensed to sell securities, the Defendant was assured by Alliance that the investment product it marketed was not a security, and thus no license was required. In selling Alliance's investment product, the Defendant was required to have investors send their funds directly to Alliance. In turn, Pioneer would issue, at a later date, a commission check to the Defendant for the sale.

As a part of his arrangement with Pioneer, the Defendant was required to advertise the investment product offered by Alliance in his local area. For the Defendant, this advertising consisted of placing two ads in the local paper in July and August of 1998, and circulating flyers within his community. According to the Defendant, the language contained in these advertisements was strictly controlled by Pioneer. As it pertains thereto, the language contained in the flyer issued by the Defendant stated as follows:

Insurance Company

Return

14.00%

Investment Insured

Are you satisfied with the interest earned from your Bank CD, Bank IRA, 401K, or Annuity? If not, please read on.

*Security* is top priority with each person's investment. I have an investment that is INSURED by Royal Indemnity Insurance Company. This company has over $100 Billion Dollars in Assets and is Rated "A" Excellent From A.M. Best (insurance analysis firm).

With this investment your return is 28% over a 25–month contract.

(14% APY–Annual Percentage Yield Example: $10000 × 28% =$12800)

You owe it to yourself to check this out! No obligation, and we pay all bank penalties for bank CD's that are invested with us.

(Plaintiff's Exhibit A). The advertisements placed by the Defendant in the local newspaper, although not as detailed, conveyed in substance this same message. (Plaintiff's Exhibits H & I).

After seeing the Defendant's advertisements, Paul and Luella Bostelman (hereinafter the "Bostelmans"), the deceased parents of the Plaintiff, Pamela Graffice, went to the Defendant's business office to discuss investing in Alliance's investment product. After consulting with the Defendant, the Bostelmans, who at that time were both just under 80 years of age, entered into a contract, in late August of 1998, to invest with Alliance. In accordance with the advertisement issued by the Defendant, the terms of this contract provided that the Bostelmans were to receive a 28% rate of return on their money over a period of 25 months. In addition, as it relates to insurance, the contract stated, "Royal Indemnity Company, as evidenced by Addendum attached herein, has insured the Equipment Purchase Program of Alliance Leasing in the amounts described in said Addendum." (Plaintiff's Exhibit C). According to the Defendant, as it relates to this latter provision, he informed the Bostelmans that only the equipment underlying the investment was

insured, not the investment itself. In addition, the Defendant testified that he informed the Bostelmans that they were not contracting with him, but instead directly with the Alliance.

In late August and early September of 1998, the Bostelman's remunerated to Alliance approximately Ninety-three Thousand dollars ($93,000.00), the amount of which constituted most of their life savings. These funds came from three sources: a Prudential High Yield Fund; an IRA; and Prudential Variable Investment Plan Annuity. (Plaintiff's Exhibits, G, L, M, N & O). As evidence of their investment, two copies of checks made out to Alliance Leasing were introduced into evidence: a check from Prudential Investment in the amount of Twenty-eight Thousand Twenty-five and 79/100 dollars ($28,025.79) and a check from Paul Bostelman in the amount of Fifty-five Thousand dollars ($55,000.00). (Plaintiff's Exhibits P & Q). Both checks were made out to Alliance; however, with regards to the latter, the Defendant wrote a receipt for the check. (Plaintiff's Exhibit Q).

Shortly after the Bostelmans invested their money with Alliance, the assets of Alliance, including those funds sent to Alliance by the Bostelmans, were frozen on account of an investigation conducted by the S.E.C. Through a letter dated October 26, 1998, the Bostelmans were informed by the Defendant that there were some problems with their investment with Alliance. (Plaintiff's Exhibit T). Eventually, after the Defendant was unable to recover the Bostelmans' investment, the Plaintiff, on behalf of the Bostelmans, sued the Defendant to recover the investment; according to the Defendant, this was the first time he had ever been sued for any form of wrongdoing.

On October 15, 1998, due to its problems with the S.E.C., Alliance filed a petition for

protection under Chapter 11 of the United States Bankruptcy Code. A trustee was then appointed to manage Alliance's business affairs. Sometime later, as a result of the trustee's efforts, the Plaintiff, on behalf of the Bostelmans, received a distribution from Alliance's bankruptcy estate of approximately Thirty-seven Thousand dollars ($37,000.00).

As a part of the trustee's effort to recover assets for Alliance's creditors, the Defendant was sued by the bankruptcy trustee to recover, as a preferential transfer, the commissions he had received from the various parties that he had solicited to invest with Alliance. On or around February 3, 2000, the Defendant reached a settlement with the bankruptcy trustee by agreeing to turnover a total of Twenty-four Thousand Forty-one and 98/100 dollars ($24,041.98) for all the commissions he had received. Included in this amount, was Three Thousand Eight Hundred dollars ($3,800.00) dollar in commission proceeds that the Defendant had earned on account of the Bostelmans' investment. However, as it pertains thereto, it was specifically pointed out that the Defendant's commission on Fifty-five Thousand dollars ($55,000.00) of the Bostelmans' investment had not been forwarded to the Defendant, and therefore was not included in the bankruptcy trustee's preference action. To secure financing for his settlement with the bankruptcy trustee, the Defendant had a second mortgage placed on his home.

At the Trial held in this matter, testimony was elicited from the Bostelmans' two daughters (the Plaintiff, Pamela Graffice, and Karen Johnston). The statements made by the daughters revealed the following information about the Bostelmans:

Both Mr. and Mrs. Bostelman were lucid at the time they made their business investment with Alliance;

After the liquidity of their investment with Alliance was called into question, both Mr. and Mrs. Bostelman began to experience great stress;

Both Mr. and Mrs. Bostelman died in March of the year 2000;

Before retiring, both Mr. and Mrs. Bostelman were employed in responsible positions;

After investing with Alliance, Mr. and Mrs. Bostelman had approximately $12,000.00 left in their savings.

In addition to the above information, the statements made by the Bostelmans' daughters alleged two matters concerning their parents' investment with Alliance. First, both daughters offered testimony that neither their mother nor their father was the type of person to engage in risky investments. In this same regard, and in contrast to those statements made by the Defendant, the daughters contend that their father was under the impression that their actual investment with Alliance, and not just the underlying equipment, was insured.

On March 26, 2001, the Defendant filed for protection under Chapter 7 of the United States Bankruptcy Code. In his bankruptcy petition, the Defendant, in addition to listing the Bostelmans, also listed those other persons with whom he had solicited funds for on behalf of Alliance. On July 23, 2001, the Plaintiff commenced the instant complaint to except from discharge the moneys lost on account of the Bostelmans' investment with Alliance.

### LAW

11 U.S.C. § 523. Exceptions to Discharge

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

## DISCUSSION

In the instant case, the Plaintiff seeks a finding that her claim against the Defendant is a nondischargeable debt. Pursuant to 28 U.S.C. § 157(b)(2)(I), this type of action is deemed a core proceeding over which this Court has been conferred with the jurisdictional authority to enter final orders. 28 U.S.C. § 1334.

■ The Plaintiff's Complaint to Determine Dischargeability rests solely on alleged violations of federal and state security laws, as well as a violation of the Consumer Sales Practices Act. However, while the Defendant may have very well violated all of these laws, such a determination does not establish the dischargeability of the debt at issue. This is because dischargeability questions are solely issues that are decided according to bankruptcy law, and therefore a dischargeabili-

ty determination does not require, and cannot be based entirely upon, consideration of a statutory violation not specified under the Bankruptcy Code. *See Barber v. Martin (In re Martin)*, 162 B.R. 710, 717–18 (Bankr.C.D.Ill.1993) ("all actions seeking a determination of nondischargeability of a debt must stand or fall on the provisions of § 523 of the Bankruptcy Code.").

As for the respective Bankruptcy Code sections that are at issue in this case, the evidence produced at Trial, as well as the briefs filed by the Plaintiff, asserted a cause of action under three statutory exceptions to discharge: § 523(a)(2)(A), fraudulent conduct; § 523(a)(4), defalcation or fraud while acting in a fiduciary capacity, embezzlement or larceny; and § 523(a)(6), willful and malicious conduct. As the Defendant presented evidence and made arguments contra to these exceptions to discharge, the Court, pursuant to Bankruptcy Rule 7015(b),[1] will address the merits of each of these sections in order.

■ Section 523(a)(2)(A) of the Bankruptcy Code implements the long-standing bankruptcy policy that only those debts which are honestly incurred are entitled to the benefits of a bankruptcy discharge. However, so as to further the fresh-start policy of the Bankruptcy Code, this exception to discharge, as well as most of the others set forth in § 523(a), is narrowly construed. *See, e.g., Griffith, Strickler, Lerman, Solymos & Calkins v. Taylor (In*

---

1. This Rule, which adopts verbatim Fed. R.Civ.P. 15, provides, "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence."

re Taylor), 195 B.R. 624, 627 (Bankr. M.D.Pa.1996). In conformance therewith, the Plaintiff bears the burden to establish, by a preponderance of the evidence, the applicability of § 523(a)(2)(A). *Staniunas v. Delisle (In re Delisle)*, 281 B.R. 457, 463 (Bankr.D.Mass.2002).

■ Four elements must exist in order for a party to prevail in a dischargeability complaint under § 523(a)(2)(A): (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss. *Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280–81 (6th Cir.1998). As it concerns these requirements, most cases revolve around the second element: whether the debtor acted with the requisite intent to defraud the creditor. Accordingly, the Court will begin its analysis with an examination of this element.

■ In the situation presented here, where a debtor invests funds on behalf of another party, a debtor will be found to have acted with the requisite intent to defraud under § 523(a)(2)(A) when, at the time the transaction occurred, it is established that the debtor, for his or her own personal gain, knowingly mislead the investor as to a material fact concerning the investment. *See Clyde–Findlay Area Cr. Union v. Burwell (In re Burwell)*, 276 B.R. 851, 854 (Bankr.N.D.Ohio 2002). As it applies to this inquiry, the Sixth Circuit Court of Appeals has held that a debtor's intent must be measured by a subjective standard. *In re Rembert*, 141 F.3d at 281. Thus, of utmost importance in any fraudulent intent analysis, is the credibility the Court attaches to the testimony of the debtor and any other witnesses called to testify.

■ However, because rarely, if ever, will a debtor admit to acting with the intent to defraud, circumstantial evidence is usually necessary to establish what the debtor's state of mind was at the time of the alleged fraud. In this regard, an examination of the traditional badges of fraud—i.e., the timing of events—is helpful. In looking at such indicia of fraud, a court should consider not only information relating to the debtor's conduct at the time of the representations, but also any evidence relating to a debtor's subsequent conduct, to the extent that such conduct provides an indication as to the debtor's state of mind at the time of the actionable representations. *Bernard Lumber Co. v. Patrick (In re Patrick)*, 265 B.R. 913, 916 (Bankr.N.D.Ohio 2001). Finally, once all of the evidence is produced, a bankruptcy court must then determine whether the circumstances, as viewed in the aggregate, present a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor. *Id.* at 916–17.

■ Turning now to the facts of this case, and keeping in mind the aforementioned principles, the Plaintiff's argument in support of fraud centers around the contention that the Defendant knowingly misrepresented to the Bostelmans that their actual investment (as opposed to just the equipment) with Alliance was insured. In more specific terms, it is the Plaintiff's position that the Bostelmans would not have invested with Alliance unless assurances had been given by the Defendant that their investment was insured. Support for this position revolves around two considerations. First, testimony was given by the Plaintiff and her sister that their parents, Mr. and Mrs. Bostelman, were not the type of people to engage in risky business endeavors. Second, the Plaintiff

argues that the advertising put forth by the Defendant, which induced the Bostelmans to invest with Alliance, was clearly misleading as to the insured nature of the Bostelmans' investment.

In considering the Plaintiff's first argument, it is apparent that it does not conform to the evidence presented. This is due to the fact that the Bostelmans, prior to investing with the Defendant, had a significant portion of their savings in the equity market, which obviously entails some risk. Moreover, the Bostelman's surely had to be aware of the risk considering that, in addition to holding responsible positions during their respective careers, both were of sound mind at the time they invested with Alliance. Thus, it is apparent that the Bostelmans, with full knowledge of the potential risks, were willing to take chances with their money in the hope that they would realize a higher rate of return.

The Plaintiff's second argument, however, concerning the deceptive nature of the Defendant's advertising, has merit. This is because a reasonable person reading the flyer and other advertisements circulated by the Defendant could have come to the conclusion that, as opposed to just the equipment, the actual investment offered by Alliance was insured. In this respect, the operative language of the flyer stated: "*Security* is top priority with each person's investment. I have an investment that is INSURED by Royal Indemnity Insurance Company." Moreover, the mere fact that the Defendant did not actually compose the advertisements himself does not, in and of itself, provide a valid defense as a person cannot claim willful ignorance to an allegation of fraud. *United States v. Stewart*, 185 F.3d 112, 126 (3rd Cir.1999) (fraud may be inferred from willful blindness); *Chorost v. Grand Rapids Factory Show Rooms, Inc.,* 172 F.2d 327, 329 (3rd Cir.

1949) (actual fraud may be found on the basis of circumstantial evidence notwithstanding willful ignorance of defrauding parties).

In addition, it is noted by the Court that the contract entered into between the Bostelmans and Alliance does not clear up the ambiguity contained in the advertisements issued by the Defendant. Specifically, the use of the word "Program," as contained in the following contractual clause, could possibly be construed to mean that a person's whole investment, as opposed to just the equipment underlying the investment, would be insured with Alliance: "Royal Indemnity Company, as evidenced by Addendum attached herein, has insured the Equipment Purchase Program of Alliance Leasing in the amounts described in said Addendum." (Plaintiff's Exhibit C).

In defense to the above, the Defendant argues that he verbally told the Bostelmans that their investment was not insured. In this same regard, the Defendant asserted that he specifically informed the Bostelmans that they were not investing with him, but instead directly with Alliance. In fact, it is the Defendant's overall position that he, like the Bostelmans, was simply an unwilling participant in a fraudulent scheme perpetrated by Alliance.

If true, the above assertions would certainly negate the existence of any fraudulent intent on the part of the Defendant. All the same, such statements must still be viewed in a critical light as, in addition to the statements being self-serving, the Bostelmans were not around to controvert the Defendant's testimony. Nevertheless, a number of external facts presented in this case do support the Defendant's credibility, thereby lending strong support for the veracity of the Defendant's testimony.

First, it is not controverted that the Defendant only began selling investment

products for Alliance after receiving a satisfactory report form the Better Business Bureau. As a result, the Defendant was given no indication that Alliance was engaged in any wrongful business practices. Second, and also not controverted, the Defendant, who has been in the insurance business for over 33 years, has never been sued on account of his misconduct. Third, and although he may have had ulterior motives,[2] the Defendant eventually returned all of the commissions (including the Bostelmans') that he had received from Pioneer. Fourth, the Defendant did not attempt to hide from the Bostelmans the financial problems associated with Alliance. Notably, the Defendant was diligent in notifying the Bostelmans that there existed a problem with their investment.

Finally, it is clear that the Defendant, who despite being in the business of selling insurance and related investment products, was not very knowledgeable with respect to the type of investment products he sold for Alliance. Thus, while the Defendant may have violated both state and federal security laws by selling Alliance's investment product, it highly questionable whether the Defendant actually knew the hazards associated with such an investment. In fact, the Plaintiff, at the Trial held in this matter, plainly acknowledged that the Defendant was probably "duped" by Alliance.

It is, however, the Plaintiff's position that even if the Defendant was "duped," he should still be held liable for fraud because, as explained above, the advertising issued by the Defendant was clearly misleading, and in any event, the Defendant was careless in his handling of the Bostelmans' investment. However, for a couple

of reasons, these assertions do not diminish the credibility of the Defendant's testimony.

First, even assuming, *arguendo,* that the Defendant was careless in his handling of the investment product offered by Alliance, at the most, such conduct provides a case for negligence; a debtor's negligence, however, is insufficient, as a matter of law, to sustain a case for fraud under § 523(a)(2)(A). *Wolf v. McGuire (In re McGuire),* 284 B.R. 481, 494 (Bankr. D.Colo.2002). Second, and more importantly, in this Circuit a subjective standard for fraud is utilized which relies heavily on personal factors such as those considerations set forth above which lend strong credibility to the Defendant's testimony. In contrast, the misleading advertisements and contract provided by the Defendant, while certainly bearing upon the Debtor's subjective intent, are more relevant in the objective context—i.e., how would a reasonable person have interpreted the Debtor's representations.

Accordingly, based upon the above analysis, the Court, although finding it to be a rather close call, is not persuaded that the Plaintiff has sustained her burden of showing that the Defendant acted with the intent to defraud the Bostelmans. As such, the Plaintiff's cause of action under § 523(a)(2)(A) of the Bankruptcy Code must be dismissed. The Court will thus now turn to address the Plaintiff's cause of action under 11 U.S.C. § 523(a)(4).

Section 523(a)(4) excepts from discharge three different types of debts: (1) debts for fraud or defalcation while acting in a fiduciary capacity; (2) debts for embezzlement; and (3) debts for larceny.

---

2. Although no such evidence was presented, it is possible that, in preparation for bankruptcy, the Defendant, by obtaining a second mortgage on his home to pay back the commissions he had received from Alliance, was simply attempting to eliminate all of the equity in house so as to make it possible for him to reaffirm on this debt.

*Ronk v. Maresh (In re Maresh)*, 277 B.R. 339, 347 (Bankr.N.D.Ohio 2001). Each of these exceptions is defined and determined according to federal law. *Ramos v. Rivera (In re Rivera)*, 217 B.R. 379, 385 (Bankr.D.Conn.1998). With respect to these grounds for nondischargeability, a requirement underlying both larceny and embezzlement is that the debtor, in obtaining the property at issue, must have acted in a fraudulent manner.[3] *Reilly v. Miano (In re Miano)*, 265 B.R. 352, 356 (Bankr. D.Conn.2001). However, as just discussed, it has already been found that the Plaintiff has not carried her burden with respect to the Defendant's alleged fraudulent conduct against the Bostelmans; thus, the only issue to address under § 523(a)(4) is whether the Defendant committed the act of defalcation while acting in a fiduciary capacity.

 As it pertains to the defalcation exception to discharge set forth under § 523(a)(4), the primary issue to address in this case is whether the Defendant was acting in a fiduciary capacity in handling the Bostelmans' investment. In a series of cases, the Sixth Circuit Court of Appeals addressed the meaning of fiduciary capacity,[4] holding that as compared to the traditional state law meaning of a fiduciary, a more narrow interpretation is required under § 523(a)(4). In particular, the Sixth Circuit requires that, in addition to the existence of a fiduciary relationship, the debtor, prior to the time of the alleged injury, must have held the funds at issue in a trust for the benefit of a third party. *R.E. America, Inc. v. Garver (In re Garver)*, 116 F.3d 176, 179 (6th Cir.1997). Furthermore, the type of trust that will give rise to a nondischargeable debt under § 523(a)(4) are, in the words of the Sixth Circuit, "limited to only those situations involving an express or technical trust relationship arising from placement of a specific res in the hands of the debtor." *Id.* at 180. This is opposed to a trust which the law implies from a contract or from an event of wrongdoing—i.e., a constructive trust. *Texas Lottery Commission v. Tran (In re Tran)*, 190 B.R. 85, 87 (Bankr. S.D.Tex.1995); *ITT Life Ins. Corp. v. Haakenson (In re Haakenson)*, 159 B.R. 875, 887 (Bankr.D.N.D.1993).

 Four requirements are necessary to establish the existence of an express trust: (1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary. *Ternansky v. Rabatin*, 141 N.E.2d 189, 191, 76 Ohio Law Abs. 203 (1957).[5] As it pertains to these requirements, a couple of things are clear. First, and of particular importance, the Defendant never obtained any

---

**3.** An embezzlement claim under the federal common law requires the existence of two elements: (1) the person was lawfully entrusted with property or property lawfully came into the hands of that person, and (2) the property was fraudulently appropriated. *Johnson v. Davis (In re Davis)*, 262 B.R. 663, 671 (Bankr.E.D.Va.2001). On the other hand, larceny for purposes of § 523(a)(4) is defined as the fraudulent and wrongful taking and carrying away of the property of another with intent to convert such property to the taker's use without the consent of the owner. *Schreibman v. Zanetti–Gierke (In re Zanetti–Gierke)*, 212 B.R. 375, 381 (Bankr.D.Kan. 1997).

**4.** These cases are, *Carlisle Cashway, Inc. v. Johnson (In re Johnson)*, 691 F.2d 249, 251 (6th Cir.1982), *Capitol Indemnity Corp. v. Interstate Agency, Inc. (In re Interstate Agency, Inc.)*, 760 F.2d 121 (6th Cir.1985), *R.E. America, Inc. v. Garver (In re Garver)*, 116 F.3d 176 (6th Cir.1997).

**5.** The requirements for a technical trust are (1) a segregated trust res, (2) identifiable beneficiaries; and (3) affirmative trust duties established by contract or statute. *Church v. Hanft (In re Hanft)*, 274 B.R. 917, 924 (Bankr. S.D.Fla.2002).

control of the Bostelmans' money, a fact which is not altered merely because the Defendant, on one occasion, issued a receipt to the Bostelmans. As it regards this latter statement, it is clear in this case that the issuance of the receipt by the Defendant was merely a vacuous act, having no bearing on the Defendant's dominion and control over the funds invested by the Bostelmans. Second, the Bostelmans' never entered into a contractual relationship with the Defendant, instead contracting directly with Alliance. In addition, it is noted that no evidence was presented that the Defendant actually advised the Bostelmans as to how they should invest their money. Instead, the Defendant merely responded to the Bostelmans' inquiries concerning the investment opportunity he was offering from Alliance. Thus, based upon these facts and observations, the Court is unable to conclude that any of the elements necessary to create an express trust are present in this case. As such, the Plaintiff may not maintain her cause of action under § 523(a)(4).

█ The Plaintiff's last asserted ground for nondischargeability rests upon the exception to discharge provided in § 523(a)(6) which excludes from a bankruptcy discharge those debts which result from a "willful and malicious injury by the debtor to another entity or to the property of another entity[.]" For purposes of § 523(a)(6), the terms "willful" and "malicious" are separate and distinct concepts, and as a result, both requirements, as defined by federal law, must be established in order to have a debt held nondischargeable *Brelage, Inc. v. Jones (In re Jones),* 276 B.R. 797, 801 (Bankr.N.D.Ohio 2001). The Plaintiff's basis for the applicability of this exception to discharge rests upon the contention that given the age and financial condition of the Bostelmans, the Defen-

dant should have realized the inappropriateness of having the Bostelmans invest with Alliance. (Plaintiff's Post Trial Brief, at pg. 9).

█ Strictly speaking, the Court does not disagree with the Plaintiff's position as any prudent person should have been extremely hesitant to place an elderly couple's entire life savings into just one speculative investment. Nevertheless, merely because the Defendant did not act in a prudent manner, does not mean that the Defendant's actions give rise to a nondischargeable debt under § 523(a)(6). Instead, the Supreme Court of the United States has held that the term "willful," as used in § 523(a)(6), is limited to only those instances where a person acts with the specific intent to cause injury, or is substantially certain that, by his or her actions, an injury will occur. *Kawaauhau v. Geiger,* 523 U.S. 57, 63–64, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). *See also Gonzalez v. Moffitt,* 252 B.R. 916 (6th Cir. BAP 2000); *Hinze v. Robinson (In re Robinson),* 242 B.R. 380 (Bankr.N.D.Ohio 1999). In the words of the Court:

> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury." Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer' mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the *conse-*

*quences of an act," not simply "the act itself."*

*Geiger,* 523 U.S. at 61, 118 S.Ct. at 977 (emphasis contained in text). As a result, "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." [6] *Id.* at 64, 118 S.Ct. at 978.

In this case, however, the Defendant's conduct clearly does not meet the standard set forth in *Geiger* because, as previously discussed, the Plaintiff has not shown that the Defendant had any actual knowledge that the Bostelmans' investment with Alliance would fail. Thus, while the evidence in this case certainly makes out a case that the Defendant was acting in a negligent manner, there is no indication that the Defendant actually intended the consequences of his actions. As such, the Court is constrained to find that the Defendant did not commit a "willful" act within the meaning of § 523(a)(6). Accordingly, the Plaintiff is not entitled to a finding of nondischargeability under this statutory exception to discharge.

In conclusion, it is clear that although the Defendant was not entirely competent in his dealing with the Bostelmans, he did not set out to deprive the Bostelmans of their money. Consequently, while the Defendant's actions vis-a-vis the Bostelmans may give rise to violations of federal and state securities law, the Defendant's actions do not rise to the level to support a claim of dischargeability under either paragraphs (a)(2)(A), (a)(4), or (a)(6) of 11 U.S.C. § 523. Accordingly, the Plaintiff's complaint must be Dismissed.

In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

Accordingly, it is

**ORDERED** that the Complaint filed by the Plaintiff, Pamela Graffice, as executrix of the estate of Paul H. Bostelman, deceased, and Luella Bostelman, deceased, be, and is hereby, DISMISSED.

It is **FURTHER ORDERED** that any legal obligation that the Defendant, Gary G. Grim, has to the Plaintiff, arising from the Defendant's transaction with the Bostelmans, be, and is hereby, determined to be a DISCHARGEABLE DEBT.

---

6. In support of her position, the Plaintiff cited to the Sixth Circuit case of *Perkins v. Scharffe,* 817 F.2d 392 (6th Cir.1987), where it was held that the term "willful" means "a deliberate and intentional doing of an act that necessarily leads to injury." This standard, however, based upon the Supreme Court's decision in *Kawaauhau v. Geiger,* was expressly overruled in *Markowitz v. Campbell (In re Markowitz),* 190 F.3d 455, 464 (6th Cir.1999).