In re Edward C. THOMPSON,
Jr., Debtor.

McHugh, Inc., Plaintiff

v.

Edward C. Thompson, Jr., Defendant.

In re James V. Ward, Debtor.

McHugh, Inc., Plaintiff

v.

James V. Ward, Defendant.

Bankruptcy Nos. 09–50201, 09–58350.
Adversary Nos. 09–2223, 09–2392.

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

Sept. 28, 2011.

See also 2011 WL 4552547.

J. Matthew Fisher, Allen, Kuehnle Stovall & Neuman LLP, Richard K. Stovall, Columbus, OH, for Debtor.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

C. KATHRYN PRESTON, Bankruptcy Judge.

On October 22, 2010, this cause came on for joint trial in the above-captioned adversary proceedings. Present at the hearing were Miles D. Fries representing the Plaintiff McHugh, Inc. ("Plaintiff"), and Rick L. Ashton and Richard K. Stovall representing the Debtors Edward C. Thompson and James V. Ward ("Thompson" and "Ward" respectively; collectively, the "Debtors"). The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the General Order of reference entered in this District. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

Plaintiff seeks to except from discharge debt allegedly owed by Debtors, pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4) and/or (a)(6). At the conclusion of presentation of Plaintiff's case, Debtors orally moved for summary judgment or directed verdict, arguing that Plaintiff had failed to prove the elements of a cause of action under any of the specified bases for nondischargeability of debt. Taking the evidence in a light most favorable to Plaintiff, as the Court is required to do at that stage of the case, the Court stated into the record its findings and conclusions relevant to Plaintiff's motion. Upon those findings and conclusions, the Court granted Debtors' motion to the extent that the Plaintiff sought judgment based on § 523(a)(4), inasmuch as Plaintiff failed to show the existence of an express or technical trust, necessary for a finding of fraud or defalcation while acting in a fiduciary capacity. The Court also granted Debtors' motion to the extent that the complaint sought judgment based on § 523(a)(6), inasmuch as Plaintiff had failed to prove facts sufficient to support a finding of conversion and thus willful and malicious injury to Plaintiff, or that Debtors acted willfully or maliciously. Finally, the Court granted Debtors' motion to the extent that Plaintiff sought judgment based on § 523(a)(2)(A) for false representations, inasmuch as Plaintiff failed to

show that either Mr. Thompson or Mr. Ward, or an agent of either of them made a material misrepresentation to Plaintiff, on which the Plaintiff relied, in order for Debtors to acquire property from the Plaintiff. However, the Court denied Debtors' motion to the extent that the Complaint sounds in actual fraud or false pretenses under § 523(a)(2)(A).

Upon the evidence adduced at the hearing and the exhibits entered into evidence, the Court makes the findings and conclusions set forth below. Because Plaintiff failed to demonstrate a basis for piercing the corporate veil and failed to show that Debtors obtained money, property, services or credit by false pretenses or actual fraud, judgment will be entered in favor of Debtors.

## I. Findings of Fact

Debtors jointly owned and operated Thompson & Ward Leasing Co., Inc. ("T & W" or "the company"), an automobile sales and leasing company, sometimes doing business as Physicians Auto Leasing. They also owned and operated (1) Florida Physicians Leasing Co., Inc. ("Fla. Physicians"), which engaged in a similar business in Florida, (2) Gem Car of Columbus, LLC ("Gem Car"), which was a new car dealership franchise, and (3) W & T Properties ("W & T Properties"), a general partnership which owned the premises where T & W and the other entities maintained their offices. T & W was established in 1988. Fla. Physicians and Gem Car were established sometime later. Debtors were the sole equity owners and the sole officers of all business entities. T & W employed approximately twelve others in addition to Debtors, some in sales and some in the office. The company maintained bank accounts at National City Bank, U.S. Bank and First Merit Bank, separate from those of the other entities and the Debtors' other business interests. It also maintained bank accounts under its trade name of Physicians Leasing Co. at the same banks. Debtors both had access to and signing authority for the company bank accounts, as did two other employees.

Fla. Physicians had five employees. It also maintained its bank accounts at National City Bank, U.S. Bank and First Merit Bank, separate from those of the other entities and the Debtors' other business interests. Gem Car had two employees and maintained accounts at The Huntington National Bank.

Both Debtors were involved in the daily operations of the company in supervisory capacities, and concede that they had the ultimate decision-making authority for the company. Thompson focused on the financial side, while Ward supervised the sales effort. Together they exercised ultimate control over all three entities. However, there were multiple management levels and Debtors were not typically involved in daily operational tasks such as hiring and firing employees, talking to customers, opening mail, and negotiating or depositing incoming checks. In particular, Debtors were not usually involved in negotiating or closing individual vehicle sales or leasing transactions.

In late September, 2008, one Dr. Thomas Rojewski contacted John Pigman, a salesperson for T & W, and expressed interested in leasing a vehicle through T & W. With the assistance of Thomas Balderson of Balderson Motor Sales,[1] Dr. Rojewski had already selected and ordered from Plaintiff the vehicle in which he was inter-

---

1. Mr. Balderson has a long standing business relationship with Plaintiff and its principle Timothy McHugh. Mr. Balderson orders from Plaintiff any Dodge automobile products requested by his customers.

ested—a 2008 limited edition Dodge Viper. The transaction proceeded in the normal fashion: Dr. Rojewski executed a lease agreement with T & W on September 25th. Mr. Pigman on behalf of T & W arranged to finance the cost of the vehicle through Telhio Credit Union ("Telhio").[2] Telhio issued a check payable to T & W in the amount of $110,931.43 on September 30, 2008; the check was endorsed (by someone other than either of the Debtors), and deposited the same day into T & W's account at U.S. Bank. The date of delivery of the vehicle is unclear, but it appears that the Viper was delivered to Dr. Rojewski between September 25th and October 1st. While this was a transaction of over $100,000, it was not uncommon for T & W to be involved in high end vehicle leases involving such an amount. Debtors were not involved in the negotiation of the lease, did not discuss or negotiate the purchase of the Viper with Mr. Balderson or Plaintiff, and were not any more closely involved in this transaction than any other done by T & W. Debtors rarely knew about a specific transaction unless the salesperson needed assistance getting to a closing or calculating the numbers for a particular lease. Even when a salesperson needed such assistance, he or she went first to the supervisor, only resorting to consulting Debtors when the manager was unable to provide sufficient help. Neither of Debtors had specific knowledge of the transaction with Plaintiff until sometime after T & W closed its doors.

On October 1st, pursuant to instructions from Mr. Pigman, Mr. Balderson obtained a vehicle title issued by the Bureau of Motor Vehicles, reflecting T & W as the owner. The title does not reflect the existence of any liens on the vehicle. Typically, the title would be exchanged for a check in the amount of the purchase price. So, armed with the title, Mr. Balderson began attempting to collect the purchase price from T & W. He spoke with T & W's salesperson, John Pigman, several times and attempted to contact Mr. Thompson, to no avail. He was prepared to deliver the title to T & W, but was never assured that a check was ready for him to pick up.

On October 3rd, $120,000 was transferred by U.S. Bank from the account into which the Telhio check had been deposited, into another account at U.S. Bank in the name of Physicians Leasing Co. (the trade name of T & W). On October 6th, a wire transfer was made from the Physicians Leasing account to an account of Gem Car at Huntington Bank, in the amount of $108,000, and on October 7th, another $50,000 was wire transferred from the Physicians Leasing account to the same Gem Car account.[3] The Physicians Leasing account was left with a balance of approximately $213,000. During this same week, Mr. Balderson was trying to obtain payment from T & W for the Viper, without success.

Some time prior to this series of events, litigation had been commenced against W & T Properties, and a receiver appointed. The affiliated companies were evidently in rapid decline. Debtors sought advice of

---

**2.** While the terms were not made known to the Court, evidently Telhio and U.S. Bank provided financing to T & W. Importantly, Telhio did not finance the vehicle specifically, as evidenced by the fact that Telhio did not make the check payable to the Plaintiff, or take a security interest in the vehicle. Rather, Telhio was providing financing to T & W.

For collateral, Telhio took an assignment of the lease.

**3.** Plaintiff also elicited evidence that check # 2795 payable to Fla. Physicians in the amount of $21,500 was issued, drawn on this same account, but the check never cleared the account The relevance of this evidence is unclear to the Court.

counsel to deal with the business issues and, presumably, winding down the businesses. Then, T & W's banking relationships failed: T & W and the affiliated entities had been in the practice of transferring funds between the companies and from account to account at National City and U.S. Bank, to cover checks written by the account holder as the checks were presented. T & W office employees, Rose Klos and Cynthia Chapman, managed the bank accounts and handled the daily banking for all the companies. National City Bank would contact T & W daily to let them know what checks had been presented, so that deposits could be made. In late September, National City notified T & W that it would no longer provide this service. Then financial chaos ensued: On October 3rd, National City closed one of T & W's accounts and froze another. As a result, National City refused any deposits, checks drawn on the accounts were returned by National City Bank to the depository bank and attempted transfers from T & W accounts to other accounts were rejected. There was limited money to fund business operations, including payment to Plaintiff for the Viper. During this time, the salespeople were unaware that the business would be closed imminently. They continued making contacts, pursuing deals and negotiating leases.

The funds had been transferred from Physicians Leasing to the account of Gem Car because of fears, later realized, that the other T & W accounts and the Florida Physicians accounts at U.S. Bank would be frozen or closed. Shortly after the transfers were made from the U.S. Bank account to Gem Car's account, the U.S. Bank accounts were frozen. All three operating entities ceased doing business on the same day—October 7, 2008. The money in the Gem Cars' account was then used to pay the last employee payroll for the three businesses, employees' insurance and attorneys' fees. On October 23rd, U.S. Bank setoff the balance remaining in the Physicians Leasing account, presumably to apply to the outstanding debt of T & W. Debtors found out about the specifics of the Rojewski transaction and the debt to Plaintiff as they were gathering business documents to provide to the receiver of W & T Properties.

## II. Conclusions of Law

Because the overarching purpose of the Bankruptcy Code is to provide a fresh start to those in need of relief from the collection efforts of creditors,[4] exceptions to discharge are to be strictly construed against the complaining party. *Rembert v. AT & T Universal Card Serv., Inc. (In re Rembert)*, 141 F.3d 277, 280–81 (6th Cir.1998), *cert. denied*, 525 U.S. 978, 119 S.Ct. 438, 142 L.Ed.2d 357 (1998). However, the relief provided by the Bankruptcy Code is intended only for the "honest but unfortunate" debtor and not to protect perpetrators of fraud or those who engage in egregious conduct. *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). To that end, Congress enacted § 523 and § 727 to provide injured creditors an avenue through which to except particular debts from discharge, or to object to issuance of a discharge altogether.

Plaintiff's remaining cause of action is brought under § 523(a)(2)(A) of the Bankruptcy Code. That section provides in pertinent part:

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt—

(2) for money, [or] property to the extent obtained, by—

4. *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

(A) false pretenses, a false representation, or actual fraud. . . .

11 U.S.C. § 523(a)(2)(A). Inasmuch as the obligation for payment of the purchase price for the Viper is that of T & W, the first question to be addressed is whether the Plaintiff may "pierce the corporate veil" to hold Debtors liable for the debt owed by T & W to Plaintiff.

A. *Plaintiff Cannot Pierce the Corporate Veil to Hold Debtors Liable for the Debt of T & W.*

■ Under Ohio law,
A fundamental rule of corporate law is that, normally, shareholders, officers, and directors are not liable for the debts of the corporation. *See* Presser, Piercing the Corporate Veil (1991) 1–4. An exception to this rule was developed in equity to protect creditors of a corporation from shareholders who use the corporate entity for criminal or fraudulent purposes. "That a corporation is a legal entity, apart from the natural persons who compose it, is a mere fiction, introduced for convenience in the transaction of its business, and of those who do business with it; but like every other fiction of the law, when urged to an intent and purpose not within its reason and policy, may be disregarded." *State ex rel. Atty. Gen. v. Standard Oil Co.* (1892), 49 Ohio St. 137, 30 N.E. 279, paragraph one of the syllabus. Under this exception, the "veil" of the corporation can be "pierced" and individual shareholders held liable for corporate misdeeds when it would be unjust to allow the shareholders to hide behind the fiction of the corporate entity. Courts will permit individual shareholder liability only if the shareholder is indistinguishable from or the "alter ego" of the corporation itself.
*Belvedere Condo. Unit Owners' Ass'n. v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274,

287, 617 N.E.2d 1075 (Ohio 1993). The *Belvedere* Court went on:

Thus, the corporate form may be disregarded and individual shareholders held liable for corporate misdeeds when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Id.* at 289, 617 N.E.2d 1075.

■ The first prong of the *Belvedere* test is a restatement of the alter-ego doctrine, which requires the plaintiff to "show that the individual and the corporation are fundamentally indistinguishable." *Belvedere*, 617 N.E.2d at 1086. To decide whether the company is an alter ego of the individual, Ohio courts consider such factors as:

(1) [G]rossly inadequate capitalization, (2) failure to observe corporate formalities, (3) insolvency of the debtor corporation at the time the debt is incurred, (4) shareholders holding themselves out as personally liable for certain corporate obligations, (5) diversion of funds or other property of the company property for personal use, (6) absence of corporate records, and (7) the fact that the corporation was a mere facade for the operations of the dominant shareholder(s).

*LeRoux's Billyle Supper Club v. Ma*, 77 Ohio App.3d 417, 422, 602 N.E.2d 685, 689 (Ohio Ct.App.1991) (citations omitted). Other Ohio courts have also considered factors such as whether there was commingling of business and personal finances, whether separate books and records were

kept, whether the company had issued stock, and whether there was misappropriation of company funds or property. *Id.*

■ Although Debtors admittedly held ultimate control over the businesses, the Court cannot find that their control over T & W was so complete that the corporation had no separate mind, will, or existence of its own. There were multiple levels of management of the company, many of whom made important company decisions, such as hiring and firing employees, negotiating important contracts, and handling company accounts. Two other employees had banking authority. Additionally, T & W had separate bank accounts. There is no indication that Debtors used the accounts as their own private sources of funds or otherwise diverted Corporate funds or property to their own purposes. The funds that they received from T & W were limited to their salaries. The Debtors observed corporate formalities, maintaining books of account and properly recognizing intercompany transfers. There is no evidence that the Debtors at any time held themselves out as personally liable for certain corporate obligations. In light of the fact that the company collapsed shortly after T & W acquired the Viper, the Court may surmise that T & W was insolvent at the time it incurred the debt to Plaintiff; however, there is no evidence that the company was undercapitalized from its inception. Moreover, there is no evidence that Debtors knew of the fragile state of T & W's financial health until accounts were frozen and closed on October 3rd. In short, there is no evidence on which the Court can apply the alter ego doctrine in order to impose T & W's debt onto Debtors.

■ In connection with the second prong of the *Belvedere* test, the Ohio Supreme Court noted that "mere control over a corporation is not in itself a sufficient basis for shareholder liability." *Belvedere,* 617 N.E.2d at 1086. The Court subsequently emphasized the requirement of wrong doing, stating that a party seeking to pierce the corporate veil "must demonstrate that the defendant shareholder exercised control over the corporation in such a manner as to commit fraud, an illegal act, or a similarly unlawful act." *Dombroski v. WellPoint, Inc.,* 119 Ohio St.3d 506, 895 N.E.2d 538 (2008). However, Ohio's high court, cautioned that, "Courts should apply this ... cautiously toward the goal of piercing the corporate veil only in instances of extreme shareholder misconduct." *Id.,* 895 N.E.2d at 545. The Court recognized that, since closely-held business entities are generally under the complete control of one or just a few equity owners, a more relaxed standard of unjust or inequitable conduct would result in piercing of the veil virtually every time a closely held entity is sued, inasmuch as "nearly every lawsuit sets forth a form of unjust or inequitable action. . . ." *Id.,* at 544–45. The court in *LeRoux's Billyle Supper Club* reiterated the point: "[D]ominance of and control over a corporation by a shareholder is insufficient, standing alone, to render the shareholder liable for corporate debts." *LeRoux's Billyle Supper Club,* 77 Ohio App.3d at 425, 602 N.E.2d 685 (citations omitted). To hold otherwise would emasculate the long standing corporate law recognizing the separate and independent existence of a corporate or other business entity.

Undoubtedly, Debtors were in ultimate control over the corporate affairs of T & W. But there is a lack of evidence that they utilized the corporation in such a manner as to commit fraud, an illegal act, or a similarly unlawful act. The simple fact illustrated by the evidence is that the business had insufficient funds to pay all of

its debts. When National City Bank froze its primary account, the company lost the ability to meet its cash flow needs. The funds available (in Gem Car's Huntington Bank account) were used to pay employees the last paycheck, meet the company's employee insurance obligations, and pay its attorneys for legal counseling as the companies wound down. Plaintiff has not demonstrated that the last available funds were used for some nefarious purpose or for the benefit of Debtors, when they could have been used to pay Plaintiff for the Viper. The simple fact is that there was not enough money to go around, forcing the company, under the supervision of Debtors, to make hard decisions where to expend the available money. Under the circumstances of this case, the fact that Plaintiff went unpaid is not by itself sufficient to find fraud or unlawful actions.

The elements of proof necessary to pierce the corporate veil are described by the Ohio Supreme Court in the conjunctive. Therefore, Plaintiff must prove all three elements in order to prevail. Having failed to illustrate the first and second elements of the test, Plaintiff's cannot succeed on its Complaint.

### B. Plaintiff Has not Demonstrated False Pretenses or Actual Fraud Under Section 523(a)(2)(A).

Even if Plaintiff had shown that the corporate veil of T & W should be pierced to visit liability on Debtors, Plaintiff has failed to demonstrate that the debt owed should be declared nondischargeable. Plaintiff failed to show that the Viper was obtained through false pretenses or actual fraud.

For purposes of § 523(a)(2)(A), actual fraud is defined broadly—"any deceit, artifice, trick or design involving a direct and active operation of the mind, used to circumvent and cheat another—

something said, done or omitted with the design of perpetrating a cheat or deception." 4 *Collier on Bankruptcy* ¶ 523.08[1][e] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2010). *See also McClellan v. Cantrell,* 217 F.3d 890, 899 (7th Cir.2000) ("[B]y distinguishing between 'a false representation' and 'actual fraud,' the statute makes clear that actual fraud is broader than misrepresentation.") (citing 4 *Collier on Bankruptcy* ¶ 523.08[1][e] (Lawrence P. King ed., 15th ed. 2000)). "Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." *McClellan,* 217 F.3d at 899 (citations omitted). Actual fraud has also been defined as "deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed." *Blascak v. Sprague (In re Sprague),* 205 B.R. 851, 859 (Bankr. N.D.Ohio 1997). In order to prevail under § 523(a)(2)(A), the Plaintiff must illustrate that the existence of an actual or positive fraud; fraud implied by law is not sufficient. *Rembert,* 141 F.3d at 281.

False pretenses are distinguishable from false representations in that "[a] false pretense involves an implied misrepresentation or conduct that is intended to create and foster a false impression while a false representation involves an express representation." *Goldberg Securities, Inc. v. Scarlata (In re Scarlata),* 127 B.R. 1004, 1009 (N.D.Ill.1991). *See also Sprague,* 205 B.R. at 859; *Wings & Rings, Inc. v. Hoo-*

ver (In re Hoover), 232 B.R. 695, 700 (Bankr.S.D.Ohio 1999).

In order to compel the Court to except the debt for the Viper from discharge, Plaintiff must show that Debtors acted with intent to defraud Plaintiff before Plaintiff parted with the vehicle—that they plotted all along to gain possession and ownership of the Viper with no intention of paying Plaintiff for it. *See* 11 U.S.C. § 523(a)(2)(A) ("A discharge ... does not discharge ... any debt ... for money [or] property ... *to the extent obtained by* ... false pretenses, a false representation, or actual fraud. . . ." (Emphasis added.)) This, Plaintiff has not done. It is uncontroverted, and the Court finds credible the testimony of Debtors that Debtors had no knowledge of the transaction with Plaintiff until long after Dr. Rojewski had possession of the Viper and after the businesses had closed. They did not typically become involved in negotiating leases and they were not involved in negotiating this one. Mr. Balderson's sole contact and the sole person involved in the transaction was T & W's salesperson and closing manager John Pigman. In fact, there were no contacts whatsoever between T & W and Plaintiff, much less between Debtors and Plaintiff. Debtors did not handle the check from Telhio when it arrived. Mr. Pigman testified unequivocally that he was not given any particular instructions by Debtors. Nor was he instructed by them to make any representations to Mr. Balderson or Plaintiff. There is no evidence to support a finding of fraud or from which this Court could infer fraud on the part of Debtors. Similarly, there is no evidence to support, or from which the Court could infer that Debtors made an implied representation or engaged in conduct intended to create or foster a false impression. This is simply an unfortunate situation whereby Plaintiff was caught in the downward slide of a business and left unpaid when insufficient funds were left at the end of the day to pay all of the company's obligations.

## III.   Conclusion

Plaintiff has failed to show that the corporate veil should be disregarded and liability visited upon Debtors. Plaintiff has further failed to demonstrate false pretenses or fraud by Debtors. Therefore, Debtors are entitled to judgment in their favor. A separate final judgment will be entered in accordance with the foregoing.

**IT IS SO ORDERED.**