IN RE: William A. LOOMIS, Katrina Y. Loomis, Debtors.

Richard W. Johnson, Plaintiff,

v.

William A. Loomis Katrina Y. Loomis, Defendants.

Case No. 15-53006
Adv. Pro. No. 15-2167

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

Opinion Entered September 26, 2016

216

John F Cannizzaro, Marysville, OH, for Plaintiff.

Derek Michael Shaw, Calig Law Firm, Columbus, OH, for Defendants.

## MEMORANDUM OPINION AND ORDER REGARDING ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY (DOC. NO. 1)

CHARLES M. CALDWELL, Judge

This Memorandum Opinion and Order serves as the Court's findings of fact and conclusions of law for the adversary proceeding filed by Richard W. Johnson (Plaintiff) against William A. and Katrina Y. Loomis (Defendants). It is based upon Section 523(a)(2)(A), (a)(2)(B), (a)(4), and (a)(6) of the United States Bankruptcy Code (Code). Plaintiff contends that two business loans totaling $8,000.00, and three credit card debts, are excepted from discharge. Considering the testimony and documents received into evidence, the Court finds and concludes that a portion of the debts are non-dischargeable. A brief history and bases for this ruling follow.

Plaintiff retired from a heating, ventilation, air-conditioning and cooling company (HVAC) after 38 years. Plaintiff's monthly retirement includes: Social Security ($1,760.00), a pension ($422.00), and rental income ($350.00). After Plaintiff retired, he attended the American School of Technology (AST), and earned HVAC, Refrigerant Handling, and EPA certifications. AST hired Plaintiff as an instructor before graduation, where he taught for approximately three years. Plaintiff and William A. Loomis (Defendant) met in 2008 while teaching HVAC courses at AST, and during that time became friends. Although AST later fired Defendant, the friendship endured, and indeed led to the financial losses suffered by Plaintiff.

Approximately a year later, on September 11, 2009, Defendant and his wife, Katrina Y. Loomis formed Restaurant Services of Ohio LLC (Restaurant Services), which provided HVAC and maintenance services to restaurants, such as Burger King. Defendant occasionally called upon Plaintiff to help troubleshoot HVAC problems for Restaurant Services. By 2011 Plaintiff started helping Restaurant Services complete work orders on a regular basis. Plaintiff enjoyed working, but never accepted payment, for fear that he would lose his Social Security benefits. However, while working on jobs, Plaintiff routinely purchased parts on his personal credit card, and then was reimbursed by Defendant.

As Restaurant Services began to grow, it became difficult for Defendant to operate out of his truck, and complete paperwork at home. As a result, he decided to lease a commercial building. In January, 2012, Defendant told Plaintiff he needed a $2,000.00 loan to pay a security deposit for commercial space. In response, on January 12, 2012, Plaintiff wrote a $2,000.00 check payable to Restaurant Services. Defendant orally agreed to pay $500.00 a month on the loan. However, twelve days prior to the loan, Restaurant Services' checking account balance was $0.81, and at the time of the loan, the balance was $1,083.24.

On January 13, 2012, Defendant deposited the $2,000.00 check in the Restaurant Services' account. Defendant acknowledged that he used that account for both business, and personal household expenses. Numerous transactions in the account were consumer purchases, including gas, food, and clothing. Most significantly, the bank statement for this period did not show the payment of a $2,000.00 security deposit.

After receiving the $2,000.00 loan, and in late January 2012, Defendant told Plaintiff that another HVAC company was going out of business. Further, Defendant told

Plaintiff that he could purchase its inventory for $6,000.00. He even showed Plaintiff a listing of the items for sale. To fund this purchase Defendant asked to borrow an additional $6,000.00. In response, Plaintiff withdrew funds from his 401K account, and on January 27, 2012, wrote yet another check, this time for $6,000.00, payable to Restaurant Services.

On that same day, Defendant deposited the check into Restaurant Services' account. However, from January 27, 2012, to February 29, 2012, many of Restaurant Services' bank transactions involved personal consumer items, such as gas, groceries and restaurants, and included airline tickets. Most significantly, the bank statements for this period do not show the purchase of $6,000.00 in inventory.

Even after borrowing a total of $8,000.00 from Plaintiff during January 2012, Defendant asked Plaintiff in the late summer of 2012, to help apply for a business credit card so his employees could purchase parts while working on jobs. As an explanation for not obtaining the card in his name, Defendant testified that he planned to buy a home, and he did not have a good credit score. Plaintiff testified that he agreed to assist Defendant thinking he was merely a "co-signer," and not the primary obligor. During the application process, Plaintiff shared his personal information—social security number, date of birth, and mailing address—with Defendants. After American Express approved the credit card, it mailed monthly billing statements to Plaintiff's residence. Rather than opening and reviewing the statements, Plaintiff blithely gave them to Defendant.

After receiving Plaintiff's personal financial identity for the American Express card, Defendant used this information to open two additional credit cards, without Plaintiff's knowledge and consent. Specifically, on June 29, 2012, Defendant applied for a "General Care" card to pay for dental work, and clumsily assumed Plaintiff's identity as "Ruchard" Johnson. In opening the General Care account, Defendant, however, used his own mailing address. On December 4, 2012, he signed a sales slip on this account for dental services in the amount of $2,455.00. Plaintiff credibly testified that he had no knowledge of the account and the related charges. Indeed, since Defendant used his own mailing address to open the General Care account, Plaintiff would never receive billing statements or any other communication.

Approximately nine months later, on September 16, 2013, Defendant applied for a Bank of America credit card in the name of "Richard Johnson, Restaurant Services." Plaintiff testified that he never authorized Defendant to use his personal financial information to apply for this third card. Plaintiff also testified that he had a personal credit card with Bank of America since 1993. Around December 2013, Plaintiff attempted to purchase gasoline using his Bank of America credit card, but the transaction was declined. Because Plaintiff's current balance was paid in full, he contacted Bank of America to inquire. Bank of America responded that he had too many outstanding credit accounts.

Surprised by this news, Bank of America referred Plaintiff to its Fraud Department. Plaintiff testified that the Department ordered a credit report, and upon receipt he met with his local bank officer to review and discuss. In addition, Plaintiff testified that during this time, he also discovered that he was the only account holder on the American Express card, and not a "co-signer."

A review of the Credit Report shows from June 29, 2012, to September 16, 2013, Bank of America, FIA Card Services, Capital One Bank, and General Care all made credit inquiries. Plaintiff credibly testified

he was unaware of and did not authorize these inquiries. In addition, the Credit Report shows that from March 1, 2013, to December 13, 2013, The Travelers Companies, Capital One Bank USA NA, Union Workers Credit Services, Barclays Bank Delaware, and USAA Federal Savings Bank made promotional inquiries.

After all these discoveries, Plaintiff contacted the Champaign County Sheriff's Department to report identity fraud. In addition, Plaintiff called General Care, and reported the card as fraud. In response, on February 9, 2014, General Care sent a letter to Plaintiff stating that it conducted an investigation, and determined that the account was opened without Plaintiff's knowledge or consent. Consequently, on February 13, 2014, General Care notified the dental office of the fraud claim, and debited $2,004.00 from the dentist's account.

Approximately a year later on May 6, 2015, Defendant and his spouse filed the present Chapter 7 bankruptcy case. On Schedule F (creditors holding unsecured non-priority claims), Defendants listed Plaintiff as holding a $1,000.00 claim for a loan. The Defendants, however, did not list the debt as disputed, liquidated, or contingent. In addition, Defendants scheduled on their Statement of Financial Affairs, Plaintiff's pending lawsuit. Approximately two months later on July 30, 2015, Plaintiff filed the present adversary complaint against Defendants, as joint owners of Restaurant Services, seeking a determination that five debts are non-dischargeable, pursuant to Sections 523(a)(2)(A), (a)(2)(B), (a)(4), and (a)(6) of the Code. To prevail under all these provisions, Plaintiff must establish proof by preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286–91, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

Before proceeding to more detailed discussions, the Court has reached three initial findings and conclusions. First, the Court finds and concludes that Section 523(a)(2)(B) of the Code (false financial statements), is not applicable. Plaintiff failed to offer absolutely any evidence of a written misrepresentation. Indeed, all the evidence focused upon oral statements. Second, with regard to the American Express card, the Court cannot make findings or draw conclusions under any of the exceptions to discharge plead by Plaintiff. For this Credit Card, the Plaintiff voluntarily gave Defendants his personal financial information, and then failed to open and review any of the statements mailed to his home. However distasteful, the losses suffered with the opening of the American Express card, are a direct result of well intentioned, but nonetheless poor judgment.

Third, fiduciary fraud, and embezzlement under Section 523(a)(4) of the Code, are not germane. There is no proof of any trust relationship between Plaintiff and Defendants. The record demonstrates that Plaintiff was not an employee of the Defendants. Instead, Plaintiff was motivated by friendship, and the desire to stay active after retirement. The two loans were just that—loans. The funds were unwisely but freely given, and as a result may not be fairly termed embezzled.

As a result of these initial findings and conclusions, further discussions will focus solely upon the two loans, and the two remaining credit cards (Bank of America and General Care). In addition, the Court's analysis is limited to whether these obligations are non-dischargeable under Sections 523(a)(2)(A) of the Code (false representations and actual fraud), (a)(4) ("larceny" portion only), and (a)(6) (willful and malicious injury).

First, addressing the two loans, the Court finds and concludes that they are non-dischargeable under both Sections 523(a)(2)(A), and (a)(6) of the Code. Regarding Section 523(a)(2)(A) (false representations and actual fraud), it provides:

(a) A discharge under section 727, ... of this title does not discharge an individual debtor from any debt—(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A).

■ Determining whether the two loans were made based upon false representations, and are non-dischargeable under this provision, requires establishing the following elements: **a)** the Defendants obtained money through representations at the time they knew were false or made with gross recklessness as to their truth; **b)** the representations were made with the intention and purpose of deceiving the Plaintiff; **c)** Plaintiff justifiably relied on such representations; and **d)** the Plaintiff sustained damage as a proximate result of the misrepresentations. *Rembert v. AT & T Universal Card Services., Inc. (In re Rembert)*, 141 F.3d 277, 280–81 (6th Cir. 1998).

■ Applying these factors to our case, Defendant told Plaintiff that he needed a $2,000.00 loan to rent commercial space for the expansion of the business. However, Defendants never paid a security deposit, according to the bank statements. While Defendants agreed to repay Plaintiff $500.00 a month towards the loan, they never did. Defendant also asked Plaintiff to loan $6,000.00 to purchase inventory. While Defendant explained to Plaintiff the purpose of the loan, Defendants never used the money to buy inventory in that amount.

In defense, Defendant testified that he did not make false statements because the loans were given for general business use. However, the bank statements show that after Defendants deposited the money, they used it primarily for personal expenses, and no amount appeared to be paid for a $2,000.00 security deposit or $6,000.00 in inventory. The Court does not find it credible that a person on a fixed and modest retirement income, would simply give a friend $8,000.00 with no specific expectation of repayment, or without the understanding that the funds would be plowed into the business to generate income for repayment.

■ Regarding intent to deceive for the two loans, the Court may consider circumstantial evidence. *Clyde–Findlay Area Cr. Union v. Burwell (In re Burwell)*, 276 B.R. 851, 854–55 (Bankr. N.D. Ohio 2002). In that regard, four chunks of information are most persuasive. First, twelve days before Plaintiff loaned Defendants $2,000.00, Restaurant Services' only had $0.81 in its checking account. Second, after Defendants deposited the checks for both the $2,000.00 and $6,000.00 loans, the funds were not used for their intended purposes, but rather served as Defendants' personal piggy bank. Third, Defendants commingled their personal and business funds in Restaurant Services' checking account, making it difficult to fully and accurately account for the $8,000.00 in loans. Fourth, Defendants failed to make any payment on the loans during the last four years. All these factors lead the Court to find and conclude that Defendants intended to deceive Plaintiff.

■ To establish justifiable reliance regarding the two loans, "the plaintiff's conduct must not be so utterly unreasonable, in light of the information apparent to him,

that the law may properly say that his loss is his own responsibility." *Ershowsky v. Freedman (In re Freedman)*, 431 B.R. 245, 259 (Bankr. S.D. Fla. 2010). On this point, there were no warning signs to alert Plaintiff that Defendant's statements were false. Indeed, in the past he purchased parts on his personal credit card, and received reimbursement from Restaurant Services. *See BancBoston Mortgage Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556, 1560 (6th Cir. 1992) ("Section 523(a)(2)(A) does not ordinarily require lenders to assume that ... borrowers who have been credible in the past will not continue to be credible.").

Finally, regarding proximate causation for the loss incurred with the two loans, it is sufficient to prove that the actions played a leading role in the loss, or were within the realm of reasonable expectation. *Williams v. Logan (In re Logan)*, 313 B.R. 745, 749 (Bankr. S.D. Ohio 2004). Defendant's false promises to use the loans in the business and to repay them with business income, is the sole reason the retired Plaintiff finds himself short $8,000.00 four years later. On all these bases, the Court finds and concludes that the two loans are excepted from discharge under Section 523(a)(2)(A) of the Code as obtained through false representations.

Addressing the two loans as non-dischargeable under Section 523(a)(6) of the Code, the debt must be for an injury that is both willful and malicious. *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463–66 (6th Cir. 1999). An actionable injury is committed where the actor desires the consequences of his act, or believes that the consequences are substantially certain to occur. *Id.* at 464. Defendants knew that Plaintiff made the two loans to pay a security deposit and to purchase inventory; however, Defendants used the loans to fund their personal life-

styles. These facts demonstrate that Plaintiff was willfully and maliciously injured in providing Defendants the two loans.

Turning to the Bank of America and General Care credit card debts, the Court finds and concludes that they are non-dischargeable, as actual fraud, pursuant to Section 523(a)(2)(A) of the Code. Actual fraud includes "any deceit, artifice, trick or design involving a direct and active operation of the mind, used to circumvent and cheat another ..." *McHugh, Inc. v. Thompson (In re Thompson)*, 458 B.R. 426, 435 (Bankr. S.D. Ohio 2011).

For actual fraud, intent to deceive regarding the remaining cards is demonstrated by two factors. First, Plaintiff did not authorize Defendants to use his personal financial information to apply for these cards, after freely giving Defendants this information for one specific credit card account (American Express card). Second, Defendant was not shy about asking for money. However, rather than asking Plaintiff for permission to use information already in his possession to open these additional credit cards, Defendants simply stole Plaintiff's identity. On these bases the Bank of America and General Care card debts are excepted from discharge, as actual fraud, under Section 523(a)(2)(A) of the Code.

Additionally, the Court finds and concludes that the Bank of America and General Care credit card debts are also non-dischargeable under solely the "larceny" portion of Section 523(a)(4) of the Code. It provides: "(a) A discharge under section 727, ... does not discharge an individual debtor from any debt—(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4) (emphasis supplied). Larceny is defined as "the fraudulent and wrongful taking and carrying away of the

property of another with intent to convert such property to the taker's use without the consent of the owner." *Graffice v. Grim (In re Grim)*, 293 B.R. 156, 166 n. 3 (Bankr. N.D. Ohio 2003). Larceny applies to credit card identity theft, as we have in this case. *Bauer v. Colokathis (In re Colokathis)*, 417 B.R. 150, 160–61 (Bankr. D. Mass. 2009).

█ Finally, the Court finds and concludes that the Bank of America and General Care credit cards are also non-dischargeable under Section 523(a)(6) of the Code (willful and malicious injury). In earlier portions of this decision the Court amply expressed the requisite standard. Suffice it to say, Defendants used Plaintiff's personal financial information to open both credit cards, without Plaintiff's knowledge and consent. Defendants even concealed the existence of the accounts by directing all monthly billing statements in Plaintiff's name to Defendants' home. As a result of Defendants' conduct, Plaintiff testified that his credit score decreased from 800 to 485. On these bases, the Court finds and concludes that the Bank of America and General Care credit card obligations are also non-dischargeable under Section 523(a)(6) of the Code.

In sum, what started out as an effort to help a friend and remain active in retirement, ends in substantial financial loss, and a violation of trust. There can be no recompense for the latter. All the Court can do is declare the financial loss non-dischargeable.

**IT IS SO ORDERED.**